UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MATTHEW CATANZARO,

                Plaintiff,                Case No. 1:11-cv-868

v.                                      Honorable Robert J. Jonker

S. HARRY et al.,

                Defendants.

_____/

## OPINION

        This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A. The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss portions of Plaintiff's complaint for failure to state a claim. The Court will order service of the remaining claims against the remaining Defendants.

## Factual Allegations

        Plaintiff Matthew Catanzaro presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Pugsley Correctional Facility (MPF), though he complains of events occurring while he was incarcerated at the Cooper Street Correctional Facility (JCS) in Jackson, Michigan, and while he was paroled to the Residential Sex Offender Program (RSOP) at the

Kalamazoo Probation Enhancement Program (KPEP) facility in Muskegon, Michigan.  Plaintiff sues the following entities and individuals: the MDOC; Patricia Caruso, the former Director of the MDOC; JCS Warden S. Harry; Michigan Parole Board members Miguel Berrios, Paul Condino, and Stephen DeBoer; RSOP Executive Director William DeBoer; RSOP Therapists A. Banks and M. Rhinesmith; RSOP Manager Edgar Hill; RSOP Case Manager Jason Kruzona; RSOP Substance Abuse Manager Ann Webb; Nurse Diane Warr; Parole Agents Marcus Wallace and "Unknown" Sarh; unknown MDOC Transportation Officers (identified as "John Doe I," "John Doe II" and "John Doe III"); and Michigan Prisoner Reentry Initiative (MPRI) Coordinator Penny Michael.

In 2006, Plaintiff pleaded guilty to a charge of second-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520c, for exposing himself to a seventeen-year-old woman.[1] He was sentenced to prison term of three to twenty-two years and six months.  In April 2009, a member of the Michigan Parole Board told Plaintiff that he would be paroled to his home if he received a good psychological report.  Later that year, Plaintiff completed a sex-offender treatment program in the prison and received a report from the program supporting release on parole.[2]

In April 2010, Defendant Condino interviewed Plaintiff regarding parole.  Condino did not mention the possibility that Plaintiff would be required to complete the RSOP as a condition for parole.  On August 1, 2010, Defendants Berrios and Condino authorized Plaintiff's parole on the condition that he complete the RSOP at the KPEP facility in Muskegon.  (*See* MDOC Parole

---

[1]According to an MDOC therapy report that is attached to the amended complaint, Plaintiff exposed himself to a store clerk and stalked her by telephone.  (Ex. 2 to Am. Compl., docket #6-2.)  Plaintiff was also convicted of attempted assault with intent to do great bodily harm in 1999, for which he served his full sentence and was released in 2005.  (*Id.*)  In addition, the report states that Plaintiff "has a long history of adult criminal behavior dating back to 1983 with multiple violations for drunk driving,[i]ndecent [e]xposure, and making obscene phone calls.  His juvenile criminal history also includes instances of [i]ndecent [e]xposure from age 15 until age 17." (*Id.*)

[2]The report notes: "[Plaintiff] appears to be ready for parole.  A strictly supervised, extended length of parole is recommended with weekly participation in therapy[,] AA and Sex Addicts Anonymous support groups.  GPS tethering would be recommended while on parole." (MDOC Therapy Termination Rep. (Nov. 16, 1009), docket #6-2, Page ID#125.)

Board Notice of Decision, Case No. 2:10-cv-28, docket #23-1, Page ID##73-75.)  On August 11, Parole Agent Sarh informed Plaintiff of his placement at the KPEP facility, which is four hours away from Plaintiff's home town and family in Port Huron, Michigan.  Plaintiff asked Sarh if he could obtain a doctor's report and have Sarh contact the parole board to show that Plaintiff did not need to be committed for treatment.  Sarh refused.  Sarh indicated that if Plaintiff refused to comply the parole order, Sarh would inform the parole board and have Plaintiff's parole revoked.

On August 16, Plaintiff participated in a video conference with MPRI Coordinator Penny Michael and an MPRI transition team from Plaintiff's home town.  The team told Plaintiff that they had arranged outpatient sex-offender treatment near Plaintiff's home, and they were ready to help Plaintiff find employment, medical care, access to a local church, and financial support.  Defendant Michael informed the team members, to their surprise, that Plaintiff was being sent to the KPEP facility in Muskegon for at least six months.  When Plaintiff requested a hearing or doctor's examination, Michael told Plaintiff that he would not have any further opportunity for a hearing regarding his placement, nor would he be examined by a doctor before being placed in the RSOP.

On August 31, Officer John Doe I picked up Plaintiff at JCS and took him across the street to the Charles Egeler Facility for processing.  Officers John Doe II and John Doe III picked up Plaintiff from the Charles Egeler Facility to take him to the KPEP facility.  Plaintiff told the officers that, because he had been paroled, he wanted to call his brother to take him home.  They told Plaintiff that he would be arrested and charged with escape if he tried to leave.  Plaintiff asserts that the officers took him to the KPEP facility against his will.

Plaintiff's parole agent, Marcus Wallace, met Plaintiff at the KPEP facility and told him that he would be confined there for six months to a year.  Wallace put a tether on Plaintiff's ankle that would alert the police if Plaintiff went beyond the parking lot of the facility.  Plaintiff would

not be permitted to leave the facility in order to look for a job or to see his family.  When Plaintiff objected to these conditions, Wallace stated that Plaintiff would be sent back to prison if he did not follow the rules of the RSOP.  Plaintiff told Wallace that he was involved in on-going litigation and he needed access to legal materials in order to pursue those actions.  Wallace said that Plaintiff would not have access to legal materials, but if he could not manage without them, he would have to be returned to prison.[3]  When Plaintiff expressed interest in attending a church, Wallace told him that he would not be allowed to attend a church and the facility did not offer any religious services. Finally, Wallace told Plaintiff that if he filed grievances for being denied "due process, access to the courts or religious service[s]," Wallace would have Plaintiff transferred back to prison.  (Am. Compl. ¶ 42.)  Due to this "threat," Plaintiff did not file grievances regarding these issues.  (*Id.*) Wallace also gave Plaintiff a written test and some papers to sign, telling Plaintiff that if he refused to answer any questions or sign any of the papers, he would be sent back to prison.  Plaintiff spent two hours with an RSOP employee signing papers and answering questions.  Some of the papers indicated that Plaintiff would be responsible for his own medical care.

Plaintiff alleges that he was prescribed medication for high blood pressure while he was in prison; however, he had only a few pills remaining in his possession when he arrived at the KPEP facility.  Plaintiff told Wallace about his high blood pressure and his need for medication. Wallace indicated that if Plaintiff had a medical emergency, RSOP staff would call an ambulance; otherwise, Plaintiff would have to be returned to prison to receive care.  Plaintiff did not want to return to prison, so he decided to conserve his remaining supply of medication and to try to manage his blood pressure through exercise and diet.  An RSOP staff member told Plaintiff that a nurse came to the facility once a week and she could monitor his blood pressure.

---

[3]Plaintiff asserts that he was not able to amend his complaint in one action, No. 1:08-cv-1173 (W.D. Mich.), which resulted in the loss of two retaliation claims, and he was not able to "bring this Habeas as a[n] Amendment to [his] already filed [habeas] case, no. 2:10-cv-28."  (Am. Compl. 12, docket #6, Page ID#80.)

When Plaintiff raised the issue of his health condition and need for medication to RSOP Case Manager Kruzona, Kruzona told Plaintiff that he was responsible for his own health care; if Plaintiff persisted in requesting medication, he would be returned to prison. Plaintiff informed Kruzona that he would try to manage his blood pressure without medication but he may need to be returned to prison if his blood pressure rose. Plaintiff told Kruzona that a nurse had checked his pressure the day before and it was "okay." (Am. Compl. ¶ 58.)

Plaintiff learned from Kruzona that the rules of the RSOP required him to participate in various classes and therapy sessions each week involving "successful thinking," "didactic therapy," "substance abuse therapy," "sex offender therapy," and "cogn[i]tive restructuring." (Am. Compl. ¶ 52.) If Plaintiff missed any classes or did not follow RSOP rules, he would be returned to prison. On September 3, Plaintiff met with RSOP Therapist Rhinesmith. Plaintiff complained to Rhinesmith that he had been committed to the KPEP facility without an examination by a doctor or psychiatrist. Rhinesmith informed Plaintiff that an examination was not necessary because Plaintiff was a sex offender. Plaintiff told Rhinesmith that he had already completed substance abuse programming in prison, but Rhinesmith indicated that everyone in the RSOP is required to go through substance abuse treatment under rules created by Defendant Webb. Rhinesmith also informed Plaintiff that he would not be able to look for a job or attend religious services because Plaintiff was at the facility "for treatment only." (Am. Compl. ¶ 62.) Rhinesmith presented Plaintiff with some paperwork, telling him that if he refused to sign it, he would be returned to prison for refusing to follow RSOP rules. Plaintiff requested an attorney before signing the papers, but Rhinesmith warned him that he could be returned to prison if he did not sign the papers. Plaintiff signed the papers without reading them.

Plaintiff also complained to RSOP Manager Hill about being "committed" to the KPEP facility, and he requested a hearing regarding the necessity for commitment as well as an

opportunity to attend a religious service.  Hill told Plaintiff that the KPEP facility did not conduct such hearings and that Plaintiff would not be allowed to leave the facility to look for a job or to attend a religious service.

Nurse Warr made regular visits to the KPEP facility and monitored Plaintiff's blood pressure.  In September, Plaintiff told Nurse Warr that he had 11 pills left of his blood pressure medication, and he would start taking this medication if his blood pressure started to rise.  Plaintiff's blood pressure rose throughout the month of September.

On or around September 14, Plaintiff complained to Nurse Warr about fungus growing on his toenails.  She recommended an antibiotic to treat the fungus.  When Plaintiff asked for medication or a doctor's appointment, she replied, "I can't do anything for you."  (Am. Compl. ¶ 89.)  Plaintiff continued to notify Warr about the fungus on his feet over the next 50 days as it spread to all of his toenails and started to cause pain in his feet.

By the first week October, Plaintiff's blood pressure had risen and he had taken what was left of his medication.  He informed Nurse Warr that he was having nose bleeds, pain in his shoulder, headaches, dizziness and difficulty with his vision.  When Plaintiff asked Warr if he was in danger of having a heart attack or stroke, she replied, "[Y]es just try to take it easy."  (Am. Compl. ¶ 87.)  Plaintiff asked Warr for medication or permission to see a doctor, but she stated, "No, I can't do anything for you."  (*Id*.)

Plaintiff notified Hill and Kruzona of his medical issues on a regular basis.  In September, they told Plaintiff that he was responsible for his own medical needs.  In October, they told Plaintiff that they would try to get some help.  A local clinic provided care for a $5.00 fee to the first person who called each morning; Hill and Kruzona would arrange to have a KPEP employee make the calls to try to get Plaintiff admitted to the clinic.  Plaintiff signed up to have someone make the calls, but he never heard anything more about it.

- 6 -

In October, Plaintiff saw the Director of the RSOP, William DeBoer, and requested a hearing to establish the need for his commitment to the KPEP facility. DeBoer denied his request. Plaintiff also complained to DeBoer that RSOP staff were denying him medication that he needed for his blood pressure. DeBoer told Plaintiff to check with his parole agent to see whether Plaintiff needed to be returned to prison.

Sometime after his arrival at the KPEP facility, Plaintiff applied to the Department of Health and Human Services for health care coverage. His first application was denied, but in November his second application was approved and he was able to receive additional blood pressure medication and a visit with a doctor. The doctor informed Plaintiff that his "blood pressure was in the high risk of having a heart attack or stroke level." (Am. Compl. ¶ 97.) The doctor doubled the dose of Plaintiff's medication to bring his blood pressure under control. The doctor also prescribed an antibiotic for the foot fungus, but told Plaintiff that it had already spread too far and probably would not respond to treatment. As the doctor predicted, the antibiotics did not work, and eventually Plaintiff had to have his toenails removed. He contends that he will need to have his toenails removed on a regular basis for the foreseeable future.

In December, Plaintiff was assigned a new therapist, Defendant Banks. When Plaintiff complained to Banks about the requirement to participate in therapy and substance abuse treatment, Banks told him that both were required as part of the RSOP. Plaintiff told Banks that he had a right to find a job and to participate in a Christian religious service, but Banks told Plaintiff that he was at the facility for treatment only, and the RSOP rules would not allow Plaintiff to work or attend religious services. Banks warned Plaintiff that if he did not follow the RSOP rules, he would be sent back to prison. Later that month, Plaintiff spoke with Defendant Webb, the substance abuse program manager for the RSOP. Plaintiff requested a hearing regarding the need for him to be held at the KPEP facility, but Webb told him that he was sent to the KPEP

facility by the parole board, and the facility did not offer such a hearing.

The KPEP facility houses county jail inmates and other participants in the KPEP, in addition to sex offenders participating in the RSOP.  Plaintiff contends that he was regularly insulted and mistreated by other residents.  They called him a child molester and a pedophile and they would serve him smaller portions of food.  On one occasion, an inmate slammed a door into Plaintiff's head.  On another occasion, an inmate said he would tell the authorities that Plaintiff had assaulted him unless Plaintiff paid him some money.

Plaintiff also contends that participants in the RSOP were treated differently from other residents at the KPEP facility.  Other residents were allowed to leave the facility to go to church, visit their family, and work at a job.  They also received benefits for doing chores at the facility.  Plaintiff, on the other hand, was not allowed to leave the facility, and he was "force[d] to work for free because [he] is a sex offender."  (Am. Compl. ¶ 116.)

Eventually, Plaintiff obtained a copy of an RSOP rule book that was different from the one that he received when he first arrived at the KPEP facility.  The book indicating that if Plaintiff completed 75% of the RSOP and received approval of a relapse prevention plan ("RPP"), he could be discharged from the RSOP.  In December, Plaintiff spoke with his parole agent, Defendant Wallace, about his RPP, and Wallace noted that Plaintiff had received excellent monthly reports and had completed 75% of the RSOP.  Wallace agreed to try to obtain approval for home placement, but said that Plaintiff needed to have his RPP approved by Defendant Banks.  When Plaintiff discussed his RPP with Banks, Banks refused to look at it.  Banks said that Plaintiff needed to complete at least six months of treatment, and Banks would not look at an RPP until two to three weeks before Banks chose to release Plaintiff.

In addition, Plaintiff asserts that he has herpes and that Nurse Warr was aware of this condition.  On January 4, 2011, Plaintiff stuffed toilet paper in his underpants in order to soothe

a herpes outbreak.  After seeing Plaintiff that day, Nurse Warr reported to KPEP staff that she noticed "a bulge through [Plaintiff's] pants in [his] genital area," which she believed was "a[n] erection meant for her because [Plaintiff] was showing her [his] new belt." (Am. Compl. ¶ 138.)

On January 10, Defendant Hill saw Plaintiff and told him "You think [you're] so slick filing a law suit on prison staff while [you're] in treatment for a sex offen[s]e [you're] going back to prison today, you can't be here."  (Am. Compl. ¶ 135.)  Hill then called someone on his cell phone and left the building.  Agent Wallace arrived later that afternoon with other parole agents and told Plaintiff about Warr's report.  Plaintiff contends that Defendants Hill, Banks, and Webb chose to send Plaintiff back to prison, and that Wallace "made up a violation," i.e. that Plaintiff engaged in behavior that was "assaultive, abusive, threatening and or intimidating by drawing attention to [his] front pant area while having a[n] erection," which are "technical rule violations." (*Id.* at ¶ 139.)

Plaintiff had not received any tickets for misconduct at the KPEP facility prior to the incident involving Nurse Warr.  Plaintiff asserts that he is white and that he was treated differently from similarly-situated black participants in the RSOP, because they were allowed to complete the RSOP even after they were found guilty of misconduct.  He alleges that Prisoners Abdullah and Houston each committed several misconducts while participating in the RSOP, but they were transferred to the RSOP in Kalamazoo and allowed to complete the program rather than forced to return to prison.

As Plaintiff was preparing for transfer back to prison, he told Agent Wallace that he needed to take his legal materials with him so that he could notify courts of his change in address. Wallace refused to allow Plaintiff to keep his materials.  As a result, Plaintiff was not able to notify the court of his change in address, and a report and recommendation (R&R) in one of his pending cases, No. 1:08-cv-11173 (E.D. Mich.), was sent to the KPEP facility instead of his new address. Plaintiff alleges that Wallace returned the R&R to the court as undeliverable.  Subsequently, the

- 9 -

court adopted the R&R and Plaintiff's retaliation claims were dismissed.

Plaintiff asserts that Defendants violated several of his constitutional rights (his claims are identified in the complaint as "Count I" through "Count X").  As relief, Plaintiff seeks damages, a declaratory judgment, an injunction barring Defendants from violating his rights, and immediate release on bond.

### Discussion

I. <u>Basis for relief</u>

Plaintiff contends that his action is a "hybrid," invoking both the civil rights statute, 42 U.S.C. § 1983, and the habeas statute, 28 U.S.C. § 2254.  To the extent Plaintiff challenges the fact or duration of his confinement, however, he has but one remedy:  an application for a writ of habeas corpus under § 2254.  *See Rittenberry v. Morgan*, 468 F.3d 331, 336-37 (6th Cir. 2006). Plaintiff cannot use a civil rights complaint to challenge his confinement; instead, he must file a habeas petition in a separate action using the standard form.  *See* Rule 2(d) of the RULES GOVERNING SECTION 2254 CASES.  The Court notes that Plaintiff has already filed a habeas petition in a separate action based on the circumstances at issue in the instant case.  *See Catanzaro v. Harry et al.*, No. 1:11-cv-867 (W.D. Mich.).  Therefore, the Court will construe the instant complaint solely as a civil rights action under § 1983, and not as a habeas petition under § 2254.

II. <u>Immunity</u>

Plaintiff sues the MDOC, but he may not maintain a § 1983 action against the MDOC.  Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826  (6th Cir. 1993).  Congress has not

expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment. *See, e.g.*, *McCoy v. Michigan*, 369 F. App'x 646, 653-54 (6th Cir. 2010); *Turnboe v. Stegall*, No. 00-1182, 2000 WL 1679478, at *2 (6th Cir. Nov. 1, 2000). In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)). Therefore, the Court will dismiss the MDOC as a Defendant because it is immune from suit.

### III.    Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Id.* at 1950 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal

rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A.    Insufficient allegations: Defendants Caruso, Stephen DeBoer

It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Gilmore v. Corr. Corp. of Am.*, 92 F. App'x 188, 190 (6th Cir. 2004) (dismissing complaint where plaintiff failed to allege how any named defendant was involved in the violation of his rights); *Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights).

### 1.    Defendant Caruso

Plaintiff names the former director of the MDOC, Patricia Caruso, as a Defendant to virtually all of his claims, but he fails to make specific factual allegations suggesting her involvement in any conduct leading to his injuries. Plaintiff merely contends that Defendants violated his rights "pursuant to . . . Caruso's customs or policies." (Am. Compl. ¶ 161.) Plaintiff does not identify any customs or policies attributable to Caruso, however. The claims raised by Plaintiff concern the terms of his parole, his transfer to KPEP facility, the restrictions imposed on him at that facility, and the revocation of his parole. Plaintiff alleges no facts suggesting that Caruso had any role in setting the terms of his parole, transferring him to the KPEP facility, controlling the conditions at the KPEP facility, revoking his parole, or enforcing any policies related thereto. Thus, Plaintiff's allegations against Caruso fall far short of the minimal pleading standards under FED. R. CIV. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"); *see also Iqbal*, 129 S. Ct. at 1950 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief.").

Furthermore, Plaintiff cannot hold Caruso liable for the conduct of other employees of the MDOC merely because of her supervisory role or authority over them. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 129 S. Ct. at 1948; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a

supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. Because Plaintiff has failed to adequately allege that Defendant Caruso engaged in any active unconstitutional behavior, she will be dismissed as a Defendant to this action.

### 2. Defendant Stephen DeBoer

Plaintiff named Michigan Parole Board member Stephen DeBoer as a defendant in his original complaint. (*See* Compl. 3, docket #1.) In the allegations of his amended complaint, however, Plaintiff has replaced DeBoer's name with that of Miguel Berrios.[4] Because there are no allegations in the amended complaint implicating Stephen DeBoer in any unconstitutional conduct, he will be dismissed as a Defendant to this action.

### B.    Count I - Procedural Due Process

In Count I, Plaintiff alleges that Defendants violated his right to procedural due process by failing to give him a hearing regarding the necessity for him to participate in the RSOP at the KPEP facility as a condition for his parole. The Due Process Clause of the Fourteenth Amendment "protects persons against deprivations of life, liberty, or property." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). To state a due-process claim, therefore, Plaintiff must identify the deprivation of a protected liberty or property interest. *See Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)). "A liberty interest may arise from the Constitution itself, by reason of the guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or

---

[4]Stephen DeBoer's name remains only in the caption on the first page of the amended complaint. (*See* Am. Compl. 1, docket #6, Page ID#69.) Plaintiff asserts that he named Stephen DeBoer as a defendant in the original complaint "when in fact it was Miguel Berrios who signed my July 23, 2010 [notice of parole board decision]." (Mot. for Immediate Consid. 1, docket #4, Page ID#67.)

policies[.]" *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).

Plaintiff's due-process claim challenges the terms and conditions of his parole. When Plaintiff was granted parole, he was a prisoner serving a term of incarceration for his conviction. Prisoners have fewer liberty interests than ordinary citizens; "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Sandin v. Conner*, 515 U.S. 472, 485 (1995). For prisoners, "[t]he Due Process Clause standing alone confers no liberty interest in freedom from state action taken 'within the sentence imposed.'" *Id.* at 480 (quoting *Hewitt v. Helms*, 459 U.S. 460, 468 (1983) (internal quotation marks omitted)). "States may under certain circumstances create liberty interests which are protected by the Due Process Clause," but such interests are "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 483-84 (internal citations omitted).

To the extent Plaintiff asserts that he had a liberty interest in parole, or in certain privileges that may accompany it, including the ability to move freely outside the prison, to choose a place of residence, or to obtain employment outside of the prison setting, he is mistaken. To begin with, there is no constitutional right to be conditionally released on parole before the expiration of a prison sentence. *Greenholtz v. Inmates of Neb. Penal & Corr. Complex*, 442 U.S. 1, 7 (1979). Although a state may establish a parole system, it has no duty to do so; thus, the presence of a parole system by itself does not give rise to a protected liberty interest in parole release. *Id.* at 7, 11; *Bd. of Pardons v. Allen*, 482 U.S. 369, 373 (1987). Rather, a liberty interest is present only if state law *entitles* an inmate to release on parole. *Inmates of Orient Corr. Inst. v. Ohio State Adult Parole Auth.*, 929 F.2d 233, 235 (6th Cir. 1991).

There is also no right to parole under Michigan law, because "a prisoner's release

on parole is discretionary with the parole board." MICH. COMP. LAWS § 791.234(11).  In *Sweeton v. Brown*, 27 F.3d 1162 (6th Cir. 1994) (en banc), the Sixth Circuit, noting "the broad powers of the Michigan authorities to deny parole," held that the Michigan system does not create a liberty interest in parole.  *Id.* at 1164-65.  Subsequent to its 1994 decision, the Sixth Circuit has recognized the continuing validity of *Sweeton* and its determination that Michigan's parole scheme creates no liberty interest in being released on parole.  *See, e.g., Crump v. Lafler*, 657 F.3d 393, 404 (6th Cir. 2011); *Foster v. Booker*, 595 F.3d 353, 368 (6th Cir. 2010).  Until Plaintiff has served his full sentence, therefore, he has no reasonable expectation of, or protected interest in, early release on parole.

Because Plaintiff does not have a protected interest in parole, it follows that he does not have a protected interest in obtaining the privileges that may accompany it.  Consequently, in setting the terms of Plaintiff's parole, Defendants were not obligated to bestow on Plaintiff any more liberty than he could have expected as a prison inmate serving the term of his sentence.  *Cf. Morrissey v. Brewer*, 408 U.S. 471, 477 (1972) (noting that "parole is an established variation on imprisonment of convicted criminals").[5]  Thus, the conditions of Plaintiff's parole implicated Plaintiff's right to due process only if they:  (1) exceeded the sentence imposed on Plaintiff "in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force," *Sandin*, 515 U.S. at 484 (citing *Vitek v. Jones*, 445 U.S. 480 (1980)); or (2) imposed "significant and atypical hardship in relation to the ordinary incidents of prison life." *Id.*  Plaintiff contends that his parole conditions implicated his right to due process for both reasons: i.e., they exceeded the sentenced imposed on him, as in *Vitek*, and they imposed significant and atypical hardship.

In *Vitek*, prison officials determined that the plaintiff, a state prisoner, was suffering

---

[5]Plaintiff cites *Morrissey* in support of his due process claim, but that case holds that parolees are entitled to due process before their parole is *revoked*, because they have a protected interest in continued liberty, *subject to the conditions of their parole*.  408 U.S. at 481-82.  Thus, *Morrissey* does not provide a basis for evaluating whether parole conditions themselves implicate a liberty interest.

from a mental illness or defect that could not be treated at the prison facility, so they transferred him to a mental health hospital for treatment under a state statute allowing the transfer of such prisoners. *Vitek*, 445 U.S. at 484.  The plaintiff claimed that the prison officials violated his right to due process because their determination of illness was not accompanied by adequate notice or a hearing. *Id.* at 485.  The Court agreed, finding that state law and practice gave the plaintiff an objective expectation that he would not be transferred unless a proper determination was made regarding his mental state. *Id.* at 489-90.  Even apart from state law and practice, however, the plaintiff was entitled to due-process because the consequences that he suffered were "qualitatively different from the punishment characteristically suffered by a person convicted of crime." *Id.* at 493.  The Court noted that "involuntary confinement to a mental hospital is not within the range of conditions of confinement to which a prison sentence subjects an individual." *Id.*  Confinement to a "mental hospital" for treatment involves more than merely a loss of freedom; it also has a stigmatizing effect on the treated individual. *Id.* at 492.  The Court concluded that, while "the restrictions on the prisoner's freedom of action at the [hospital] by themselves might not constitute the deprivation of a liberty interest . . . the stigmatizing consequences of a transfer to a mental hospital for involuntary psychiatric treatment, coupled with the subjection of the prisoner to mandatory behavior modification as a treatment for mental illness, constitute the kind of deprivations of liberty that requires procedural protections." *Id.* at 494.

Plaintiff claims that he should have received a hearing regarding the necessity for him to be confined at the KPEP facility and to participate in all aspects of the RSOP, including the mental health and substance abuse treatment programs.  He likens the KPEP facility to the "mental hospital" in *Vitek*, and contends that his participation in the RSOP's treatment program is comparable to the involuntary treatment that the plaintiff in *Vitek* received.  *Vitek* is distinguishable from Plaintiff's case for multiple reasons, however.  First, unlike *Vitek*, Plaintiff does not identify a

state law giving him an objective expectation of parole without participation in a program like the RSOP. As the Court discussed, *supra*, Michigan law does not entitle prisoners to parole under any conditions. Second, unlike the defendants in *Vitek*, Defendants did not change Plaintiff's classification or legal status (i.e. by making a formal determination that Plaintiff suffers from a mental illness). The parole board ostensibly required Plaintiff to participate in the RSOP because he was convicted of a sex offense; Plaintiff does not challenge the fact that he is a sex offender, or contend that a hearing is required to determine whether he was convicted of a sex offense.

Third, requiring a convicted sex offender to undergo rehabilitative treatment related to that offense is wholly different than requiring a prisoner to undergo involuntary mental health treatment. Sex-offender rehabilitation does not exceed the sentence imposed on a convicted sex offender "in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force." *Sandin*, 515 U.S. at 484. According to the Supreme Court, "'[a] paramount objective of the corrections system is the rehabilitation of those committed to its custody.'" *McKune v. Lile*, 536 U.S. 24, 36 (2002) (quoting *Pell v. Procunier*, 417 U.S. 817, 823 (1974)).

In *McKune*, the Supreme Court concluded that requiring a convicted sex offender to admit responsibility for his criminal conduct as part of a prison rehabilitation program did not violate the prisoner's Fifth Amendment right against self-incrimination. *Id.* at 29, 48. In that context, the Court noted that "rehabilitation is a legitimate penological interest that must be weighed against the exercise of an inmate's liberty." *Id.* at 36 (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 351 (1987)). It also noted that the due process standard in *Sandin* "provide[s] useful instruction" for evaluating the scope of a prisoner's Fifth Amendment rights. *Id.* at 37. According to *McKune*, the state's penological interest in treating and rehabilitating sex offenders is particularly strong, because:

> When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape

or sexual assault. . . .  U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997). States thus have a vital interest in rehabilitating convicted sex offenders.

Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism. See U.S. Dept. of Justice, Nat. Institute of Corrections, A Practitioner's Guide to Treating the Incarcerated Male Sex Offender xiii (1988) ("[T]he rate of recidivism of treated sex offenders is fairly consistently estimated to be around 15%," whereas the rate of recidivism of untreated offenders has been estimated to be as high as 80%. "Even if both of these figures are exaggerated, there would still be a significant difference between treated and untreated individuals").

*Id.* at 33.  Thus, while *McKune* did not consider a due-process claim, it strongly suggests that requiring a sex-offender to complete a sex-offender rehabilitation program normally does not implicate the offender's right to due process, because any deprivation of the offender's liberty is outweighed by the state's penological interest in rehabilitation of sex offenders.

Similarly, several courts have concluded that sex-offender classifications and mandatory sex-offender treatment for convicted sex offenders do not require additional due process protections beyond the conviction.  *See Meza v. Livingston*, 607 F.3d 392, 401 (5th Cir. 2010) ("[W]hen an individual is convicted of a sex offense, no further process is due before imposing sex offender conditions."); *Jennings v. Owens*, 602 F.3d 652, 659 (5th Cir. 2010); *Neal v. Shimoda*, 131 F.3d 818, 831 (9th Cir. 1997) (holding that  an inmate required to participate in a treatment program as a condition for parole "has received the minimum protections required by due process" where he "has been convicted of a sex crime in a prior adversarial setting").  *Cf. Renchenski v. Williams*, 622 F.3d 315, 327 (3d Cir. 2010) ("[M]andating Renchenski's participation in [the sex-offender treatment program] is not within the sentence imposed *since he is incarcerated for committing murder in the first degree and not for committing a sexual offense*.") (emphasis added); *Coleman v. Dretke*, 395 F.3d 216, 222 (5th Cir. 2004) ("[T]he Ninth and Eleventh Circuits

have held that prisoners *who have not been convicted of a sex offense* have a liberty interest created by the Due Process Clause in freedom from sex offender classification and conditions.  We agree.") (emphasis added); *Kirby v. Siegelman*, 195 F.3d 1285, 1292 (11th Cir. 1999) ("An inmate *who has never been convicted of a sex crime* is entitled to due process before the state declares him to be a sex offender.") (emphasis added).  Following the logic of *McKune* and the foregoing cases, Defendants' decision to require Plaintiff to complete a sex-offender treatment program as a condition for parole did not violate the Due Process Clause because Plaintiff is a convicted sex offender.

Finally, *Vitek* is distinguishable because Plaintiff acknowledges that he participated in a sex offender treatment program before he was paroled, including mental health therapy and treatment for substance abuse.  There is no indication that treatment in the RSOP is significantly more invasive than the treatment that Plaintiff received while he was in prison, and the Court cannot discern how the RSOP would have additional stigmatizing effects for Plaintiff.  Moreover, even if there is some additional stigma associated with participation in the RSOP, stigma alone is not sufficient to invoke procedural due process protection.  *Paul v. Davis*, 424 U.S. 693, 701 (1976) (harm to reputation is not, in itself, sufficient to invoke procedural due process); *Dean v. McWherter*, 70 F.3d 43, 45 (6th Cir. 1995) (The stigma from being labelled mentally ill "does not, without more, impute a liberty interest sufficient to trigger due process protections."); *Mertik v. Blalock*, 983 F.2d 1353, 1362 (6th Cir.1993) ("Injury to reputation, standing alone, is not a liberty interest protected by the Fourteenth Amendment.").  In sum, therefore, the requirement that Plaintiff participate in the RSOP as a condition for his parole did not exceed the sentence imposed on Plaintiff as to invoke the protections of the Due Process Clause.

Plaintiff also contends that the particular conditions of his confinement at KPEP implicated his right to due process under *Sandin* because they imposed significant and atypical

- 20 -

hardship on him in comparison to his confinement at JCS.  At JCS, Plaintiff was given ten hours of "yard time" each day and he had access to a weight pit, running track, gym, sports facilities, a television, a mailbox, a law library, and health care services.  (Am. Compl. ¶ 26.)  He also had the opportunity to work in a prison job and to attend religious services.  Finally, his parents were able to visit him regularly.  In contrast, at the KPEP facility Plaintiff did not have the foregoing privileges or benefits.  He did not have access to recreational facilities or a law library, he could not work, and he had to arrange for his own health care.  In addition, he did not have the opportunity to attend religious services, and he was located farther away from his family.

The Court notes that the relevant baseline for examining "atypical and significant hardship" is not, as Plaintiff proposes, his conditions at JCS.  Instead, the Court must consider hardship at the KPEP facility in comparison to the "ordinary incidents of prison life."  *Sandin*, 515 U.S. at 484.  "[T]he Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *see Meachum v. Fano*, 427 U.S. 215, 225 (1976) ("That life in one prison is much more disagreeable than in another does not in itself signify that a Fourteenth Amendment liberty interest is implicated when a prisoner is transferred to the institution with the more severe rules.").  Only in the most extreme circumstances has the Court recognized a prisoner's liberty interest in avoiding transfer to a facility with more adverse conditions.  *See Wilkinson*, 545 U.S. at 223–24 (finding that confinement in a "Supermax" prison imposed "atypical and significant" hardship because prisoners were kept in conditions similar to solitary confinement and lost their ability to seek parole, but that standing alone these conditions of confinement might not create a liberty interest).  Plaintiff does not allege that he was subject to restrictions comparable to solitary confinement, as in *Wilkinson*.  Moreover, courts considering the type of restrictions alleged by Plaintiff have found that they do not impose significant and atypical hardship.  *See Coleman v. Governor of Mich.*, 413 F. App'x 866,

876-77 (6th Cir. 2011) (limited access to recreational facilities); *Dobbins v. Craycraft*, 423 F. App'x

550, 552 (6th Cir. 2011) (loss of a prison job); *Carter v. Tucker*, 69 F. App'x 678, 680 (6th Cir.

2003) ("A prisoner has no constitutional right to prison employment or a particular prison job.

Further, the Constitution and federal law do not create a property right for inmates in a job, they

likewise do not create a property right to wages for work performed by inmates.") (citing *Newsom*

*v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989)).[6]   In addition, because "an inmate possesses no

inherent constitutional right to placement in any particular prison," *Williams v. Bass*, 63 F.3d 483,

485 (6th Cir. 1995), it follows that Plaintiff's parole to a location farther from his family did not

implicate a liberty interest.   Furthermore, to the extent Plaintiff suffered at the hands of other

residents at the KPEP facility, Defendants were not responsible for such conduct.   Finally, to the

extent Plaintiff lacked access to adequate medical care and a law library, or was unable to practice

his religion, those conditions are addressed, *infra*, in connection with Plaintiff's First and Eighth

Amendment claims.

      Plaintiff cites a number of cases in support of his claim in Count I, in addition to *Vitek*

and *Sandin*.   (*See* Am. Compl. 39-41, docket #6, Page ID##107-09.)   The cited cases do not save

Plaintiff's claim from dismissal because they concern circumstances that are not at issue, including:

involuntary civil commitment,[7] revocation of parole,[8] classification as a sex offender,[9] and

---

[6]Plaintiff cites *Kaufhold v. Bright*, 835 F. Supp. 294 (W.D. Va. 1993), which held that a parolee has a protected right to legitimate employment. *Id.* at 300.  That case is not binding on this Court, however.  Furthermore, it is not persuasive because it provides no direct authority for its conclusion; indeed, the defendants in that case were given qualified immunity because "the court [could not] unqualifiedly say that the Constitution compels a parolee's unrestricted access to any chosen occupation.  Rather, the Supreme Court's pronouncements on parolees' rights militate against that conclusion." *Id.*

[7]*See Addington v. Texas*, 441 U.S. 418, 425 (1979); *Humphrey v. Cady*, 405 U.S. 504, 507 (1972); *Doe v. Austin*, 848 F.2d 1386, 1391 (6th Cir. 1988); *United States v. Phelps*, 955 F.2d 1258, 1266 (9th Cir. 1992); *Bailey v. Pataki*, 722 F. Supp. 2d 443, 447-48 (S.D.N.Y. 2010); *United States v. Baker*, 836 F. Supp. 1237 (E.D.N.C. 1993).

[8]*See Morrissey*, 408 U.S. at 481-82.

[9]*See Kirby v. Siegelman*, 195 F.3d 1285 (11th Cir. 1999).

mandatory mental health counseling as part of a sentence.[10]  Plaintiff was not civilly committed or required to undergo mental health treatment as part of his sentence, and he does not claim that Defendants classified him as a sex offender or revoked his parole without due process.

In sum, Plaintiff does not have constitutionally-protected interest in parole or in any liberty attached thereto.  The particular conditions of his parole did not exceed the sentence imposed on him, as in *Vitek*, and they did not impose significant and atypical hardship under *Sandin*.  Therefore, Count I will be dismissed because, in the absence of a protected liberty interest, Plaintiff fails to state a procedural due process claim.

## C.  Count II - 18 U.S.C. §§ 4245-4246

In Count II, Plaintiff asserts that Defendants violated 18 U.S.C. §§ 4245, 4246. Section 4245 concerns the involuntary transfer of prisoners to mental health treatment facilities. *See* 18 U.S.C. § 4245(a).  Section 4246 concerns the hospitalization and commitment of prisoners to mental health facilities past the term of their sentences.  *See id.* at § 4246(a).  In both circumstances, a court must conduct a hearing to determine whether the prisoner "is presently suffering from a mental disease or defect" that requires hospitalization.  18 U.S.C. §§ 4245(c)-(d), 4246(c)-(d).  The foregoing statutory provisions concern the duties of the federal Bureau of Prisons with respect to federal prisoners in its custody.  *See* 18 U.S.C. § 4042.  Plaintiff is in the custody of the MDOC, and he challenges the conduct of state officials acting pursuant to their authority under state law.  Thus, Plaintiff's claim that Defendants violated these statutes is without merit.

## D.  Count III - Substantive Due Process

In Count III, Plaintiff alleges that the decision to transfer him to the KPEP facility violated his right to *substantive* due process because it should have been made by a physician. (Am. Compl. at 39, docket #6, Page ID#110.)  "A plaintiff asserting a substantive due process claim

---

[10]*See United States v. Barajas*, 331 F.3d 1141, 1143 (10th Cir. 2003).

faces a virtually insurmountable uphill struggle.  He must show that the government conduct in question was so reprehensible as to 'shock the conscience' of the court."  *Rimmer-Bey v. Brown*, 62 F.3d 789, 791 n.4 (6th Cir. 1995) (citing *Rochin v. California*, 342 U.S. 165 (1952)); *Mertik v. Blalock*, 983

F.2d 1353, 1367-68 (6th Cir. 1993)); *see also Hampton v. Hobbs*, 106 F.3d 1281, 1288 (6th Cir. 1997).  In *County of Sacramento v. Lewis*, 523 U.S. 833 (1988), the Supreme Court reiterated its reluctance to expand the concept of substantive due process.  *Id.* at 842.  While the core of substantive due process is protection from arbitrary government action, "only the most egregious official conduct" is arbitrary in the constitutional sense.  *Id.* at 846.  The Court noted that behavior most likely to "shock the conscience" and thus support a substantive due process claim is "conduct intended to injure in some way unjustifiable by any government interest."  *Id.* at 849.  Plaintiff's required participation in the RSOP as a condition for his parole does not shock the conscience; it serves the state's legitimate interest in protecting the members of the community from future sex offenses.  *See McKune*, 536 U.S. at 33 ("Therapists and correctional officers widely agree that clinical rehabilitative programs can enable sex offenders to manage their impulses and in this way reduce recidivism.").  There is also no indication that Defendants intended to injure Plaintiff by sending him to, or confining him at, the KPEP facility.  Accordingly, Plaintiff fails to state a substantive due process claim.

Plaintiff also asserts in Count III that his current confinement is illegal because his parole conditions were unconstitutional.  To the extent Plaintiff challenges the validity of his current confinement, however, his claim must be brought as a petition for habeas corpus; such a claim is not the proper subject of a civil rights action under § 1983.  *See Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) (the essence of habeas corpus is an attack by a person in custody upon the legality of that custody and the traditional function of the writ is to secure release from illegal

custody).[11]   For the foregoing reasons, therefore, Count III will be dismissed for failure to state a claim.

### D.   Counts IV, V - Fourth Amendment

In Count IV, Plaintiff asserts that Defendants violated his Fourth Amendment rights in connection with his transfer to the KPEP facility because he was "forced . . . into a MDOC van and into a [b]uilding without a warrant, criminal charges or probable cause determination for any arrest." (Am Compl. 43.)  In Count V, Plaintiff asserts that he was falsely imprisoned in the KPEP facility under threat of being charged with escape if he tried to leave.  The Fourth Amendment prohibits unreasonable searches and seizures by the government. U.S. CONST., AMEND IV.  Plaintiff was a convicted prisoner under the lawful custody of the MDOC when Defendants allegedly "arrested" him and then "imprisoned" him at the KPEP facility.  *See* MICH. COMP. LAWS § 791.238(1) (paroled prisoners are under the legal custody and control of the MDOC).  In Michigan, "parole [is] construed as a permit . . . to leave the prison, and not as a release."  MICH. COMP. LAWS § 791.238(6).  Plaintiff was not entitled to freedom of movement outside of prison except under the conditions set by the parole board; thus, Defendants did not violate the Fourth Amendment because they were legally entitled to escort Plaintiff to the KPEP facility and detain him there on behalf of the MDOC.  Therefore, Counts IV and V will be dismissed for failure to state a claim.

### E.   Count VI - Eighth Amendment

In Count VI, Plaintiff alleges that Defendants Banks, Berrios, Condino, William DeBoer, Hill, Kruzona, Rhinesmith, Wallace, Warr, and Webb violated his rights under the Eighth Amendment when he was denied adequate medical care for his high blood pressure and toenail fungus.  He alleges that he complained about his condition and need for treatment to Agent

---

[11] Plaintiff cites two cases in support of his claim that his current confinement is illegal. *See Wildermuth v. Furlong*, 147 F.3d 1234 (10th Cir. 1998); *Kell v. U.S. Parole Comm'n*, 26 F.3d 1016 (10th Cir. 1994).  In both *Kell* and *Wildermuth*, the prisoners sought habeas corpus relief.

Wallace, Nurse Warr, RSOP Case Manager Kruzona, RSOP Manager Hill, and RSOP Executive Director William DeBoer, but they did not provide him with the treatment or medication that he needed.  The Eighth Amendment obligates state officials to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976) (noting that "[a]n inmate must rely on prison authorities to meet his medical needs; if the authorities fail to do so, those needs will not be met").  The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner.  *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  A claim for the deprivation of adequate medical care has an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*  Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Upon review, the Court concludes that Plaintiff's allegations are sufficient to warrant service of Claim VI against Defendants Hill, Kruzona, Wallace, Warr, and William DeBoer.  Plaintiff does not state a claim against Defendants Banks, Berrios, Condino, Rhinesmith, or Webb, however.  Plaintiff does not allege that the latter Defendants were even aware of Plaintiff's medical needs while he was at the KPEP facility, much less that they were deliberately indifferent to them. Consequently, his allegations against Banks, Berrios, Condino, Rhinesmith, and Webb are not sufficient to state a claim.

Similarly, to the extent Plaintiff sues Defendants Banks, Berrios, Condino, Rhinesmith, or Webb solely because of their supervisory role or authority over other individuals, he fails to state a claim. *See* Section III.A.1 of this Opinion, *supra*. "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. Plaintiff has not alleged that Defendants Banks, Berrios, Condino, Rhinesmith, or Webb engaged in any active unconstitutional behavior with respect to Plaintiff's medical needs. Accordingly, they will be dismissed as Defendants with respect to Count VI.

### F.    Count VII - First Amendment

In Count VII, Plaintiff claims that Defendants Banks, Berrios, Condino, William DeBoer, Hill, Kruzona, Rhinesmith, Wallace and Webb impermissibly burdened his First Amendment right to practice his religion by denying him the opportunity to attend Christian church services. The Court concludes that the allegations in Count VII are sufficient to warrant service of this claim on the foregoing Defendants.

### G.    Count VIII[12] - Equal Protection

In Count VIII, Plaintiff alleges that Defendants Banks, Berrios, Condino, William DeBoer, Hill, Wallace and Webb violated his right to Equal Protection when they acted to revoke his parole and send him back to prison. Plaintiff alleges that he is white and that two similarly-situated black prisoners were treated differently than him. Prisoners Abdullah and Houston committed major misconducts while they were in the RSOP, but they were not returned to prison; instead, they were allowed to complete the RSOP. Plaintiff contends that Banks, Hill, Wallace and Webb chose to return him to prison; this decision, Plaintiff contends, was "wholly arbitrary, irrational and without a rational relation to a legit[i]mate purpose and . . . [was made] with vindictive animus

---

[12]This count is identified in the complaint as "Count IIX." (*See* Am. Compl. 45, docket #6.)

with the intent to punish [Plaintiff] for filing the law suit on prison staff."  (Am. Compl. ¶ 148.) According to Plaintiff, had Defendants treated Plaintiff similarly to black prisoners like Abdullah and Houston, Plaintiff would not be incarcerated; instead, he would have completed the RSOP and satisfied the conditions for his release on parole.

In essence, Plaintiff claims that Defendants revoked his parole for discriminatory and/or retaliatory reasons.  Civil rights actions challenging the revocation of parole are barred by the doctrine of *Heck v. Humphrey*, 512 U.S. 477, 486 (1994).  Under *Heck*, claims challenging the lawfulness of a conviction or term of confinement are not cognizable under § 1983 until the conviction or sentence "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  *Id.* at 486-87.  The principles espoused in *Heck* have been applied to § 1983 actions challenging state parole revocation proceedings.  *See, e.g., Norwood v. Mich. Dep't of Corr.*, 67 F. App'x 286, 287 (6th Cir. 2003).  Plaintiff's sole federal remedy to challenge the revocation of his parole is by writ of habeas corpus.  *See Preiser*, 411 U.S. at 500.  Plaintiff has not demonstrated the invalidity of his parole revocation by either a state or federal habeas corpus decision.  Therefore, the claims against Defendants in Count VIII will be dismissed because they are not cognizable under § 1983.

In addition, though Defendants Condino, Berrios and William DeBoer are named as Defendants to Count VIII, though there are no allegations suggesting that they were involved in the revocation of his parole, much less that they discriminated or retaliated against Plaintiff in violation of his constitutional rights.  Therefore, Plaintiff's claims against Defendants Condino, Berrios, and William DeBoer in Count VIII are subject to dismissal for the additional reason that they fail to allege any unconstitutional conduct by these Defendants.  *See Gilmore*, 92 F. App'x 190; *Frazier*, 41 F. App'x at 764.

**H.      Count IX - Retaliation**

In Count IX, Plaintiff contends that Parole Board members Berrios and Condino paroled him to the RSOP.  Plaintiff filed a habeas corpus petition that was served on them on April 12, 2010.  *See Catanzaro v. Quigley et al.*, No. 2:10-cv-28 (W.D. Mich.).  The Court considered and rejected substantially the same claim in connection with Plaintiff's habeas petition.  (*See Catanzaro v. Harry et al.*, No. 1:11-cv-867, 12/29/2011 Op. 8-10, docket #13.)  To the extent Plaintiff raises the same claim in this action, it is barred under the doctrine in *Heck v. Humphrey*, 512 U.S. 477 (1994).  Even if Plaintiff's challenge to the 2010 parole decision is not *Heck*-barred, he does not state a retaliation claim for the reasons discussed in the Court's December 29, 2011 opinion in Case No. 1:11-cv-867.  To summarize that discussion, Plaintiff's allegations of retaliation are too conclusory to state a claim.  Therefore, Count IX will be dismissed for failure to state a claim.

**I.      Count X - Access to the courts**

In Count X, Plaintiff contends that Defendants Berrios, Condino, William DeBoer, Webb, and Wallace violated Plaintiff's right of access to the Courts by (1) denying him access to a law library or law books during his time at the KPEP facility, and (2) preventing him from bringing his legal materials with him when he left the KPEP facility.  It is well established that prisoners have a constitutional right of access to the courts.  *Bounds v. Smith*, 430 U.S. 817, 821 (1977).  The principal issue in *Bounds* was whether the states must protect the right of access to the courts by providing law libraries or alternative sources of legal information for prisoners.  *Id.* at 817.  The Court held that in addition to law libraries or alternative sources of legal knowledge, the states must provide indigent inmates with "paper and pen to draft legal documents, notarial services to authenticate them, and with stamps to mail them."  *Id.* at 824-25.  *Bounds* did not create an abstract, free-standing right to a law library, litigation tools, or legal assistance, however.  *Lewis v. Casey*, 518 U.S. 343, 351 (1996).  In order to state a viable claim for interference with access

to the courts, a plaintiff must show "actual injury." *Id*. at 349. In other words, a plaintiff must plead and demonstrate that the shortcomings in the lack of legal materials have hindered, or are presently hindering, his efforts to pursue a nonfrivolous legal claim. *Id*. at 351-53. Further, the Supreme Court squarely has held that "the underlying cause of action . . . is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002) (citing *Lewis*, 518 U.S. 353 & n.3). Thus, "the complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id*. at 417-18.

### 1.   Access to a law library

Plaintiff contends that he did not have access to a law library or law books at KPEP, which he needed to amend his complaint in *Garrison et al. v. MDOC et al.*, No. 1:08-cv-11173 (E.D. Mich.). Because he could not amend his complaint, he lost two retaliation claims. (Am. Compl ¶ 37.) He further alleges that the lack of access to a law library "resulted in [him] not being able to [bring] this habeas as a[n] Amendment to my already filed [habeas case]," *Catanzaro v. Quigley et al.*, No. 2:10-cv-28 (W.D. Mich.). (Am. Compl. ¶ 38.)

Plaintiff's claim that the lack of access to a law library caused any injury is purely conclusory. Plaintiff's allegations provide no support for his assertion that the denial of access to law books or a law library prevented him from amending either his complaint or his habeas petition. In other words, the allegations do not plausibly suggest a connection between Defendants' conduct (i.e., failure to provide adequate legal materials) and Plaintiff's alleged injuries. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 129 S. Ct. at 1949-50; *Twombly*, 550 U.S. at 555.

Even assuming Plaintiff's allegations satisfy the causation aspect of an access-to-

courts claim, Plaintiff does not adequately describe the nature of the underlying claims that he purports to have lost.  According to *Christopher*, a plaintiff must "state the underlying claim . . . just as if it were being independently pursued."  *See* 536 U.S. at 415-18.  Plaintiff has not satisfied that pleading requirement.  Accordingly, Plaintiff does not state an access-to-courts claim with respect to the lack of a law library at the KPEP facility.

2.   Access to personal legal files

Plaintiff further alleges that, on January 10, 2011, Wallace prevented Plaintiff from bringing his own legal papers with him out of the KPEP facility.  As a result, Plaintiff was unable to notify the court of an address change in *Garrison et al. v. Mich. Dep't of Corr. et al.*, No. 1:08-cv-11173 (E.D. Mich.).  A Report and Recommendation (R&R) issued in that action on February 10, 2011, after Plaintiff was transferred to prison, but the court mailed a copy of its R&R to the KPEP facility.  The court adopted the R&R on February 28, 2011, because no objections had been filed by Plaintiff and the court had not been notified of any change in Plaintiff's address.  Plaintiff asserts that because he did not receive the R&R, he lost the opportunity to object to the dismissal of two retaliation claims.  (Am. Compl. ¶ 152.)

Plaintiff's allegations fail to establish a plausible link between Wallace's conduct and his alleged injury.  Under the local rules of the Eastern District of Michigan, Plaintiff was obligated to "promptly" notify the court of any change in address.  *See* E.D. Mich. LCivR 11.2.  After Plaintiff returned to prison in early January, nearly two months passed before the court adopted the R&R at the end of February, but  there is no indication that Plaintiff attempted to contact the court during that time.  Plaintiff contends that he needed access to his legal materials to notify the court, but he does not indicate why.  A notice of change in address merely requires knowledge of the Court's address and the prisoner's new address; it does not require any information regarding a prisoner's pending cases.  The Court cannot discern any reason why Plaintiff would have needed his legal

materials to notify the Court of his new address; thus, Plaintiff's allegations are insufficient to state a plausible claim against Wallace. *See Iqbal*, 129 S. Ct. at 1950 ([W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief.").

Moreover, even if Plaintiff needed his legal materials, there is no indication that he attempted to explain to the court the reasons for his failure to file objections to the R&R.  Plaintiff can hardly complain that Defendant Wallace caused him to lose certain claims when Plaintiff failed to pursue relief available to him.  For the foregoing reasons, therefore, the access-to-courts claim against Wallace in Count X will be dismissed for failure to state a claim.

## J.      Conspiracy

According to Plaintiff, Defendants conspired to violate his rights.  (Am. Compl. 39.) To state a claim for conspiracy, a plaintiff must plead with particularity, as vague and conclusory allegations unsupported by material facts are insufficient. *Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one); *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir. 2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987); *Smith v. Rose*, 760 F.2d 102,106 (6th Cir. 1985).  A plaintiff's allegations must show (1) the existence or execution of the claimed conspiracy, (2) overt acts relating to the promotion of the conspiracy, (3) a link between the alleged conspirators, and (4) an agreement by the conspirators to commit an act depriving plaintiff of a federal right.  *Lepley v. Dresser*, 681 F. Supp. 418, 422 (W.D. Mich. 1988).  "[V]ague allegations of a wide-ranging conspiracy are wholly conclusory and are, therefore, insufficient to state a claim."  *Hartsfield v. Mayer*, No. 95-1411, 1996 WL 43541, at *3 (6th Cir. Feb. 1, 1996).  A simple allegation that defendants conspired to cover up wrongful actions is too conclusory and too speculative to state

a claim of conspiracy.  *Birrell v. Michigan,* No. 94-2456, 1995 WL 355662, at *2 (6th Cir. June 13, 1995).

Plaintiff's conspiracy claim is entirely conclusory and speculative.  His allegations, even viewed in the light most favorable to Plaintiff, describe a number of discrete facts that occurred over a period of time involving multiple individuals.  None of these allegations suggest an agreement between Defendants to violate his rights, however.  Accordingly, Plaintiff fails to state a plausible conspiracy claim.

IV.     Pending motions

Plaintiff indicates in his original and amended complaint that he needs counsel. (*See* Compl. 44, docket #1; Am. Compl. 47, docket #6.)  He has also filed a motion for a stay of service of the complaint (docket #4), and two motions for order of service of the amended complaint (docket ##7, 9).

A.      Motion for appointment of counsel

To the extent Plaintiff requests court-appointed counsel, it is well-established that indigent parties in civil cases have no constitutional right to a court-appointed attorney.  *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604-05 (6th Cir. 1993).  The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur- Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604-05; *see Mallard v. U.S. Dist. Court*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances.  In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel.  *See Lavado*, 992 F.2d at 606.  The Court has carefully considered these factors and determines that, at this stage of the case, the assistance

- 33 -

of counsel does not appear necessary to the proper presentation of Plaintiff's position.  Therefore, Plaintiff's request for appointment of counsel will be denied.

### B.      Motion to stay service of the complaint

Plaintiff requests that the Court stay service of the original complaint so that he can file an amended complaint (docket #4).  Plaintiff's request is moot because he has since filed his amended complaint (*see* docket #6), and the Court has considered that complaint in this Opinion.

### C.      Motions for service

Finally, Plaintiff moves the Court to order service of the complaint upon all Defendants by the United States Marshal pursuant to Rule 4(c)(2) of the Federal Rules of Civil Procedure (docket ## 7, 9).  Plaintiff's motions for service will be granted, in part, as set forth in this Opinion.  After dismissal of certain claims and Defendants as set forth in this Opinion, the Court will order service of the remaining claims on the remaining Defendants.

### <u>Conclusion</u>

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that the claims in Counts I, II, III, IV, V, VIII ("IIX"), IX, and X of the complaint will be dismissed with prejudice for failure to state a claim.  In addition, Defendants MDOC,  MDOC Transportation Officers (John Doe I, John Doe II, and John Doe III), Caruso, Stephen DeBoer, Harry, Michael, and Sarh will be dismissed as Defendants from this action.  Finally, Defendants Banks, Berrios, Condino, and Rhinesmith will dismissed as Defendants with respect to Count VI. The Court will order service of the following claims against the following Defendants:  Count VI against Defendants William DeBoer, Hill, Kruzona, Wallace, and Warr, and Count VII against Defendants Banks, Berrios, Condino, William DeBoer, Hill, Kruzona, Rhinesmith, Wallace and Webb.

In addition, Plaintiff's motion for appointment of counsel (taken from docket ##1, 6) and motion for a stay (docket #4) will be denied.  Finally, Plaintiff's motions for service of the complaint (docket ##7, 9) will be granted in part at set forth in this Opinion.

Orders will be entered that are consistent with this Opinion.


_____/s/Robert J. Jonker_____
ROBERT J. JONKER
UNITED STATES DISTRICT JUDGE

Dated:  January 31, 2012