UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW CATANZARO,

                Plaintiff,

v.

S. HARRY, *et al.*,

                Defendants.

_____/

Case No. 1:11-cv-868

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

       This is a civil rights action brought by a former state prisoner and parolee of the

Michigan Department of Corrections (MDOC) pursuant to 42 U.S.C. § 1983.[1]  This matter is now

before the court on the following motions:  Motion for summary judgment filed by defendant

Marcus Wallace (docket no. 26); Motion for summary judgment filed by defendant Miguel Berrios

(docket no. 48); Motion for summary judgment filed by defendant Paul Condino (docket no. 63);

Rule 12(b)(6) motion to dismiss filed by defendants William DeBoer, Edgar Hill, Jason Kruzona,

M. Rhinesmith (correct name Bryan Rhinesmith), Ann Webb, Anita Banks and Diane Warr (docket

no. 66); "Motion to correct oversight or omission in this court's January 31, 2012 order" filed by

defendant Anne Webb (docket no. 68); Motion for summary judgment filed by defendants William

DeBoer, Edgar Hill, Jason Kruzona, M. Rhinesmith (correct name Brian Rhinesmith), Ann Webb,

Anita Banks and Diane Warr (docket no. 76); and plaintiff's cross-motion for summary judgment

(docket no. 85).

---

[1] MDOC public records indicate that plaintiff was released on parole on September 11, 2012.  *See*
http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=313263.

## I. Plaintiff's claims

The Court previously summarized plaintiff's claims alleged in his 165-paragraph amended complaint (docket no. 6) as follows:

> Plaintiff Matthew Catanzaro presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Pugsley Correctional Facility (MPF), though he complains of events occurring while he was incarcerated at the Cooper Street Correctional Facility (JCS) in Jackson, Michigan, and while he was paroled to the Residential Sex Offender Program (RSOP) at the Kalamazoo Probation Enhancement Program (KPEP) facility in Muskegon, Michigan. Plaintiff sues the following entities and individuals: the MDOC; Patricia Caruso, the former Director of the MDOC; JCS Warden S. Harry; Michigan Parole Board members Miguel Berrios, Paul Condino, and Stephen DeBoer; RSOP Executive Director William DeBoer; RSOP Therapists A. Banks and M. Rhinesmith; RSOP Manager Edgar Hill; RSOP Case Manager Jason Kruzona; RSOP Substance Abuse Manager Ann Webb; Nurse Diane Warr; Parole Agents Marcus Wallace and "Unknown" Sarh; unknown MDOC Transportation Officers (identified as "John Doe I," "John Doe II" and "John Doe III"); and Michigan Prisoner Reentry Initiative (MPRI) Coordinator Penny Michael.

> In 2006, Plaintiff pleaded guilty to a charge of second-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520c, for exposing himself to a seventeen-year-old woman. [FN 1] He was sentenced to prison term of three to twenty-two years and six months. In April 2009, a member of the Michigan Parole Board told Plaintiff that he would be paroled to his home if he received a good psychological report. Later that year, Plaintiff completed a sex-offender treatment program in the prison and received a report from the program supporting release on parole. [FN 2]

> In April 2010, Defendant Condino interviewed Plaintiff regarding parole. Condino did not mention the possibility that Plaintiff would be required to complete the RSOP as a condition for parole. On August 1, 2010, Defendants Berrios and Condino authorized Plaintiff's parole on the condition that he complete the RSOP at the KPEP facility in Muskegon. (See MDOC Parole Board Notice of Decision, Case No. 2:10-cv-28, docket #23-1, Page ID##73-75.) On August 11, Parole Agent Sarh informed Plaintiff of his placement at the KPEP facility, which is four hours away from Plaintiff's home town and family in Port Huron, Michigan. Plaintiff asked Sarh if he could obtain a doctor's report and have Sarh contact the parole board to show that Plaintiff did not need to be committed for treatment. Sarh refused. Sarh indicated that if Plaintiff refused to comply the parole order, Sarh would inform the parole board and have Plaintiff's parole revoked.

On August 16, Plaintiff participated in a video conference with MPRI Coordinator Penny Michael and an MPRI transition team from Plaintiff's home town. The team told Plaintiff that they had arranged outpatient sex-offender treatment near Plaintiff's home, and they were ready to help Plaintiff find employment, medical care, access to a local church, and financial support. Defendant Michael informed the team members, to their surprise, that Plaintiff was being sent to the KPEP facility in Muskegon for at least six months. When Plaintiff requested a hearing or doctor's examination, Michael told Plaintiff that he would not have any further opportunity for a hearing regarding his placement, nor would he be examined by a doctor before being placed in the RSOP.

On August 31, Officer John Doe I picked up Plaintiff at JCS and took him across the street to the Charles Egeler Facility for processing. Officers John Doe II and John Doe III picked up Plaintiff from the Charles Egeler Facility to take him to the KPEP facility. Plaintiff told the officers that, because he had been paroled, he wanted to call his brother to take him home. They told Plaintiff that he would be arrested and charged with escape if he tried to leave. Plaintiff asserts that the officers took him to the KPEP facility against his will.

Plaintiff's parole agent, Marcus Wallace, met Plaintiff at the KPEP facility and told him that he would be confined there for six months to a year. Wallace put a tether on Plaintiff's ankle that would alert the police if Plaintiff went beyond the parking lot of the facility. Plaintiff would not be permitted to leave the facility in order to look for a job or to see his family. When Plaintiff objected to these conditions, Wallace stated that Plaintiff would be sent back to prison if he did not follow the rules of the RSOP. Plaintiff told Wallace that he was involved in on-going litigation and he needed access to legal materials in order to pursue those actions. Wallace said that Plaintiff would not have access to legal materials, but if he could not manage without them, he would have to be returned to prison. When Plaintiff [FN 3] expressed interest in attending a church, Wallace told him that he would not be allowed to attend a church and the facility did not offer any religious services. Finally, Wallace told Plaintiff that if he filed grievances for being denied "due process, access to the courts or religious service[s]," Wallace would have Plaintiff transferred back to prison. (Am. Compl. ¶ 42.) Due to this "threat," Plaintiff did not file grievances regarding these issues. (*Id.*) Wallace also gave Plaintiff a written test and some papers to sign, telling Plaintiff that if he refused to answer any questions or sign any of the papers, he would be sent back to prison. Plaintiff spent two hours with an RSOP employee signing papers and answering questions. Some of the papers indicated that Plaintiff would be responsible for his own medical care.

Plaintiff alleges that he was prescribed medication for high blood pressure while he was in prison; however, he had only a few pills remaining in his possession when he arrived at the KPEP facility. Plaintiff told Wallace about his high blood pressure and his need for medication. Wallace indicated that if Plaintiff had a

medical emergency, RSOP staff would call an ambulance; otherwise, Plaintiff would have to be returned to prison to receive care. Plaintiff did not want to return to prison, so he decided to conserve his remaining supply of medication and to try to manage his blood pressure through exercise and diet. An RSOP staff member told Plaintiff that a nurse came to the facility once a week and she could monitor his blood pressure.

When Plaintiff raised the issue of his health condition and need for medication to RSOP Case Manager Kruzona, Kruzona told Plaintiff that he was responsible for his own health care; if Plaintiff persisted in requesting medication, he would be returned to prison. Plaintiff informed Kruzona that he would try to manage his blood pressure without medication but he may need to be returned to prison if his blood pressure rose. Plaintiff told Kruzona that a nurse had checked his pressure the day before and it was "okay." (Am. Compl. ¶ 58.)

Plaintiff learned from Kruzona that the rules of the RSOP required him to participate in various classes and therapy sessions each week involving "successful thinking," "didactic therapy," "substance abuse therapy," "sex offender therapy," and "cogn[i]tive restructuring." (Am.Compl. ¶ 52.) If Plaintiff missed any classes or did not follow RSOP rules, he would be returned to prison. On September 3, Plaintiff met with RSOP Therapist Rhinesmith. Plaintiff complained to Rhinesmith that he had been committed to the KPEP facility without an examination by a doctor or psychiatrist. Rhinesmith informed Plaintiff that an examination was not necessary because Plaintiff was a sex offender. Plaintiff told Rhinesmith that he had already completed substance abuse programming in prison, but Rhinesmith indicated that everyone in the RSOP is required to go through substance abuse treatment under rules created by Defendant Webb. Rhinesmith also informed Plaintiff that he would not be able to look for a job or attend religious services because Plaintiff was at the facility "for treatment only." (Am. Compl. ¶ 62.) Rhinesmith presented Plaintiff with some paperwork, telling him that if he refused to sign it, he would be returned to prison for refusing to follow RSOP rules. Plaintiff requested an attorney before signing the papers, but Rhinesmith warned him that he could be returned to prison if he did not sign the papers. Plaintiff signed the papers without reading them.

Plaintiff also complained to RSOP Manager Hill about being "committed" to the KPEP facility, and he requested a hearing regarding the necessity for commitment as well as an opportunity to attend a religious service. Hill told Plaintiff that the KPEP facility did not conduct such hearings and that Plaintiff would not be allowed to leave the facility to look for a job or to attend a religious service.

Nurse Warr made regular visits to the KPEP facility and monitored Plaintiff's blood pressure. In September, Plaintiff told Nurse Warr that he had 11 pills left of his blood pressure medication, and he would start taking this medication if his blood

pressure started to rise. Plaintiff's blood pressure rose throughout the month of September.

On or around September 14, Plaintiff complained to Nurse Warr about fungus growing on his toenails. She recommended an antibiotic to treat the fungus. When Plaintiff asked for medication or a doctor's appointment, she replied, "I can't do anything for you." (Am. Compl. ¶ 89.) Plaintiff continued to notify Warr about the fungus on his feet over the next 50 days as it spread to all of his toenails and started to cause pain in his feet.

By the first week October, Plaintiff's blood pressure had risen and he had taken what was left of his medication. He informed Nurse Warr that he was having nose bleeds, pain in his shoulder, headaches, dizziness and difficulty with his vision. When Plaintiff asked Warr if he was in danger of having a heart attack or stroke, she replied, "[Y]es just try to take it easy." (Am. Compl. ¶ 87.) Plaintiff asked Warr for medication or permission to see a doctor, but she stated, "No, I can't do anything for you." (*Id.*)

Plaintiff notified Hill and Kruzona of his medical issues on a regular basis. In September, they told Plaintiff that he was responsible for his own medical needs. In October, they told Plaintiff that they would try to get some help. A local clinic provided care for a $5.00 fee to the first person who called each morning; Hill and Kruzona would arrange to have a KPEP employee make the calls to try to get Plaintiff admitted to the clinic. Plaintiff signed up to have someone make the calls, but he never heard anything more about it.

In October, Plaintiff saw the Director of the RSOP, William DeBoer, and requested a hearing to establish the need for his commitment to the KPEP facility. DeBoer denied his request. Plaintiff also complained to DeBoer that RSOP staff were denying him medication that he needed for his blood pressure. DeBoer told Plaintiff to check with his parole agent to see whether Plaintiff needed to be returned to prison.

Sometime after his arrival at the KPEP facility, Plaintiff applied to the Department of Health and Human Services for health care coverage. His first application was denied, but in November his second application was approved and he was able to receive additional blood pressure medication and a visit with a doctor. The doctor informed Plaintiff that his "blood pressure was in the high risk of having a heart attack or stroke level." (Am. Compl. ¶ 97.) The doctor doubled the dose of Plaintiff's medication to bring his blood pressure under control. The doctor also prescribed an antibiotic for the foot fungus, but told Plaintiff that it had already spread too far and probably would not respond to treatment. As the doctor predicted, the antibiotics did not work, and eventually Plaintiff had to have his toenails

removed. He contends that he will need to have his toenails removed on a regular basis for the foreseeable future.

In December, Plaintiff was assigned a new therapist, Defendant Banks. When Plaintiff complained to Banks about the requirement to participate in therapy and substance abuse treatment, Banks told him that both were required as part of the RSOP. Plaintiff told Banks that he had a right to find a job and to participate in a Christian religious service, but Banks told Plaintiff that he was at the facility for treatment only, and the RSOP rules would not allow Plaintiff to work or attend religious services. Banks warned Plaintiff that if he did not follow the RSOP rules, he would be sent back to prison. Later that month, Plaintiff spoke with Defendant Webb, the substance abuse program manager for the RSOP. Plaintiff requested a hearing regarding the need for him to be held at the KPEP facility, but Webb told him that he was sent to the KPEP facility by the parole board, and the facility did not offer such a hearing.

The KPEP facility houses county jail inmates and other participants in the KPEP, in addition to sex offenders participating in the RSOP. Plaintiff contends that he was regularly insulted and mistreated by other residents. They called him a child molester and a pedophile and they would serve him smaller portions of food. On one occasion, an inmate slammed a door into Plaintiff's head. On another occasion, an inmate said he would tell the authorities that Plaintiff had assaulted him unless Plaintiff paid him some money.

Plaintiff also contends that participants in the RSOP were treated differently from other residents at the KPEP facility. Other residents were allowed to leave the facility to go to church, visit their family, and work at a job. They also received benefits for doing chores at the facility. Plaintiff, on the other hand, was not allowed to leave the facility, and he was "force[d] to work for free because [he] is a sex offender." (Am. Compl. ¶ 116.)

Eventually, Plaintiff obtained a copy of an RSOP rule book that was different from the one that he received when he first arrived at the KPEP facility. The book indicating that if Plaintiff completed 75% of the RSOP and received approval of a relapse prevention plan ("RPP"), he could be discharged from the RSOP. In December, Plaintiff spoke with his parole agent, Defendant Wallace, about his RPP, and Wallace noted that Plaintiff had received excellent monthly reports and had completed 75% of the RSOP. Wallace agreed to try to obtain approval for home placement, but said that Plaintiff needed to have his RPP approved by Defendant Banks. When Plaintiff discussed his RPP with Banks, Banks refused to look at it. Banks said that Plaintiff needed to complete at least six months of treatment, and Banks would not look at an RPP until two to three weeks before Banks chose to release Plaintiff.

In addition, Plaintiff asserts that he has herpes and that Nurse Warr was aware of this condition. On January 4, 2011, Plaintiff stuffed toilet paper in his underpants in order to soothe a herpes outbreak. After seeing Plaintiff that day, Nurse Warr reported to KPEP staff that she noticed "a bulge through [Plaintiff's] pants in [his] genital area," which she believed was "a[n] erection meant for her because [Plaintiff] was showing her [his] new belt." (Am. Compl. ¶ 138.)

On January 10, Defendant Hill saw Plaintiff and told him "You think [you're] so slick filing a law suit on prison staff while [you're] in treatment for a sex offen[s]e [you're] going back to prison today, you can't be here." (Am. Compl. ¶ 135.) Hill then called someone on his cell phone and left the building. Agent Wallace arrived later that afternoon with other parole agents and told Plaintiff about Warr's report. Plaintiff contends that Defendants Hill, Banks, and Webb chose to send Plaintiff back to prison, and that Wallace "made up a violation," i.e. that Plaintiff engaged in behavior that was "assaultive, abusive, threatening and or intimidating by drawing attention to [his] front pant area while having a[n] erection," which are "technical rule violations." (*Id.* at ¶ 139.)

Plaintiff had not received any tickets for misconduct at the KPEP facility prior to the incident involving Nurse Warr. Plaintiff asserts that he is white and that he was treated differently from similarly-situated black participants in the RSOP, because they were allowed to complete the RSOP even after they were found guilty of misconduct. He alleges that Prisoners Abdullah and Houston each committed several misconducts while participating in the RSOP, but they were transferred to the RSOP in Kalamazoo and allowed to complete the program rather than forced to return to prison.

As Plaintiff was preparing for transfer back to prison, he told Agent Wallace that he needed to take his legal materials with him so that he could notify courts of his change in address. Wallace refused to allow Plaintiff to keep his materials. As a result, Plaintiff was not able to notify the court of his change in address, and a report and recommendation (R&R) in one of his pending cases, No. 1:08-cv-11173 (E.D. Mich.), was sent to the KPEP facility instead of his new address. Plaintiff alleges that Wallace returned the R&R to the court as undeliverable. Subsequently, the court adopted the R&R and Plaintiff's retaliation claims were dismissed.

Plaintiff asserts that Defendants violated several of his constitutional rights (his claims are identified in the complaint as "Count I" through "Count X"). As relief, Plaintiff seeks damages, a declaratory judgment, an injunction barring Defendants from violating his rights, and immediate release on bond.

[FN 1 According to an MDOC therapy report that is attached to the amended complaint, Plaintiff exposed himself to a store clerk and stalked her by telephone. (Ex. 2 to Am. Compl., docket #6-2.)

Plaintiff was also convicted of attempted assault with intent to do great bodily harm in 1999, for which he served his full sentence and was released in 2005. (*Id.*) In addition, the report states that Plaintiff "has a long history of adult criminal behavior dating back to 1983 with multiple violations for drunk driving,[i]ndecent [e]xposure, and making obscene phone calls. His juvenile criminal history also includes instances of [i]ndecent [e]xposure from age 15 until age 17." (*Id.*)]

[FN 2 The report notes: "[Plaintiff] appears to be ready for parole. A strictly supervised, extended length of parole is recommended with weekly participation in therapy[,] AA and Sex Addicts Anonymous support groups. GPS tethering would be recommended while on parole." (MDOC Therapy Termination Rep. (Nov. 16, 1009), docket #6-2, Page ID#125.)]

[FN 3 Plaintiff asserts that he was not able to amend his complaint in one action, No. 1:08-cv-1173 (W.D. Mich.), which resulted in the loss of two retaliation claims, and he was not able to "bring this Habeas as a[n] Amendment to [his] already filed [habeas] case, no. 2:10-cv-28." (Am. Compl. 12, docket #6, Page ID#80.)]

Opinion at pp. 1-10 (docket no. 10).

Plaintiff's amended complaint includes ten counts directed at defendants: Count I (procedural due process); Count II (violation of 18 U.S.C. §§ 4245 and 4246); Count III (substantive due process); Counts IV and V (Fourth Amendment violations); Count VI (Eighth Amendment violations); Count VII (First Amendment violations); Count VIII (equal protection); Count IX (retaliation); and, Count X (access to the courts consisting of two claims (a) access to a law library and (b) access to his legal papers).

The court dismissed Counts I, II, III, IV, V, VIII, IX, and X with prejudice for failure to state a claim. *Id.* at p. 34. In addition, the court dismissed defendants MDOC, MDOC Transportation Officers (John Doe I, John Doe II, and John Doe III), Caruso, Stephen DeBoer,

Harry, Michael, and Sarh will be dismissed as defendants from this action. *Id.* The court also dismissed defendants Banks, Berrios, Condino, and Rhinesmith with respect to Count VI. *Id.*

The court ordered service on two groups of defendants. First, the court ordered service of Count VI (Eighth Amendment violations) against defendants William DeBoer, Hill, Kruzona, Wallace, and Warr. *Id.* Second, the court ordered service of Count VII (First Amendment violations) against defendants Banks, Berrios, Condino, William DeBoer, Hill, Kruzona, Rhinesmith, Wallace and Webb. *Id.* Defendants have filed several motions regarding these claims.

## II. "Motion to correct oversight or omission in this court's January 31, 2012 order" filed by defendant Anne Webb (docket no. 68).

Defendant Webb points out a scrivener's error in the court's January 31, 2012 "Order for partial dismissal and partial service" (docket no. 11). In the accompanying opinion entered that date, the court found that Count VI of the amended complaint failed to state a claim against defendants Banks, Berrios, Condino, Rhinesmith, or Webb. *See* Opinion at p. 26 (docket no. 10). However, the court's order for partial dismissal and partial service failed to dismiss Count VI as to defendant Webb. *See* Order (Jan. 31, 2012) at p. 2. Defendant Webb asks that the court correct the error and indicate that the claims asserted against her in Count VI are dismissed with prejudice. The Court agrees. Accordingly, defendant Webb's motion should be granted and the "Order for partial dismissal and partial service" (docket no. 11) should be amended nunc pro tunc to reflect that Count VI is dismissed as to defendant Webb.

### III. Motions for summary judgment

### A. Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present

significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).[2]

## B.     The parole board members

On July 23, 2010, defendants Miguel Berrios and Paul Condino, at that time members of the Michigan Parole Board, entered a decision granting plaintiff parole, effective August 31, 2010. *See* Parole Board Notice of Decision (docket no. 79-1). The grant of parole involved several conditions including: 1.5 ("You must complete sexual offender treatment or other treatment when

---

[2] The court notes that it previously denied plaintiff's request for additional discovery as set forth in his "F.R.C.P. 56(d) Affidavit". *See* Affidavit (docket no. 87); Order (docket no. 89). The court is aware that denying a Rule 56(d) motion and ruling on a motion for summary judgment, when the parties have no opportunity for discovery may "likely to be an abuse of discretion." *See Siggers v. Campbell*, 652 F.3d 681, 696 (6th Cir.2011). As pointed out in the previous order, the plaintiff did engage in some discovery. In addition to the reasons as set forth in its earlier order, the court notes that plaintiff's "Affidavit" is neither affidavit nor declaration sufficient to obtain relief under Fed. Rules Civ. Proc. 56(d). The affidavit is not notarized. *See* M.C.L. § 55.265(a) (defining a "jurat" as "a certification by a notary public that a signer, whose identity is personally known to the notary public or proven on the basis of satisfactory evidence, has made in the presence of the notary public a voluntary signature and taken an oath or affirmation vouching for the truthfulness of the signed record." The absence of a jurat or other evidence of verification requires a court to find that the document fails to constitute an affidavit. *Knobloch v. Langholz*, No. 231070, 2002 WL 1360388 at *2 (Mich. App. June 21, 2002) (unpublished). *See Kelley v. City of Flint*, 251 Mich. 691, 696; 232 N.W. 407 (1930) ("[a] purported affidavit, on which perjury could not be assigned if it was wilfully false, would not, in law, be an affidavit at all"). Finally, plaintiff's document is not an unsworn declaration made under penalty of perjury pursuant to 28 U.S.C. § 1746.

you are referred by the field agent"); 3.4 ("You must complete the following program: RSOP"); and, 4.3 ("You must reside in/at the following location upon your release to parole: KPEP - 985 E. Barney, Muskegon, MI 49444"). *Id.* Plaintiff has alleged that defendants Berrios and Condino (neither of whom are currently on the Parole Board), violated his constitutional rights when they voted to grant him parole. Amend. Compl. at ¶¶ 2-3. Plaintiff's only remaining claim against these two defendants is set forth in his Count VII, in which he alleged that they violated his First Amendment right to attend church because the grant of parole included a condition that plaintiff attend RSOP. *Id.* at p. 45.

Plaintiff cannot sustain a § 1983 claim for damages against these two defendants for granting him parole. "[P]arole board members are absolutely immune from liability for their conduct in individual parole decisions when they are exercising their decision making powers." *Horton v. Martin*, 137 Fed. Appx. 773, 775 (6th Cir. 2005), quoting *Walter v. Torres*, 917 F.2d 1379, 1384 (5th Cir.1990). *See also, Solomon v. Golloday*, No. 2:11-cv-287, 2012 WL 2522493 at *5 (W.D.Mich. June 28, 2012) ("Members of a parole board have absolute immunity from damages liability for actions taken in the performance of their duties regarding the decision to grant or deny parole because that task is functionally comparable to that of a judge. . . The actions for which plaintiff complains were taken by defendant Parole Board members in their quasi-judicial function of deciding whether to grant or deny plaintiff's parole; therefore, they are entitled to absolute immunity") (internal citations omitted). To the extent that plaintiff seeks injunctive relief, he has not shown how these two former parole board members can grant him any relief. Accordingly, the court should grant defendant Berrios and Condino's motions for summary judgment (docket nos. 48 and 63).

## C.    The KPEP employees and KPEP contract nurse

In Count VI, plaintiff alleged that KPEP employees William DeBoer, Edgar Hill and Jason Kruzona, as well as a nurse at KPEP, Diane Warr, violated his Eighth Amendment rights by being deliberately indifferent to his serious medical needs.  In Count VII, plaintiff alleged that KPEP employees William DeBoer, Ann Webb, Edgar Hill, Jason Kruzona, Bryan Rhinesmith and Anita Banks violated his First Amendment rights by preventing him from attending church.  At all relevant times to this action, defendants DeBoer, Hill, Kruzona, Webb, Rhinesmith and Banks were employees of KPEP. DeBoer Aff. at ¶ 2 (docket no. 77-2); Webb Aff. at ¶ 2 (docket no. 77-3); Hill Aff. at ¶ 2 (docket no. 77-4); Rhinesmith Aff. at ¶ 2 (docket no. 78-1);  Kruzona Aff. at ¶ 2 (docket no. 77-5); Banks Aff. at ¶ 2 (docket no. 78-2).  In addition, Nurse Warr was employed by United Nursing Services which provided nursing services to KPEP.  Warr Aff. at ¶¶ 2-3 (docket no. 78-3). The KPEP employees and Nurse Warr have moved for summary judgment on both Counts VI and VII (docket no. 76).  Plaintiff's cross-motion for summary judgment (docket no. 85) is essentially a response to this motion.  Accordingly, the court will address the arguments set forth in both motions below.

### 1.    The KPEP RSOP

"KPEP is a private non-profit organization which operates residential and non-residential programs for adult offenders as a community-based alternative to incarceration." William DeBoer Aff. at ¶ 2.  KPEP's RSOP program is designed to be a six-month minimum residential stay in a therapeutic environment, with the goal of assisting the client in maintaining abstinence from drugs, alcohol, criminal behavior and sexually deviant behavior.  *Id.*  The KPEP RSOP was independently developed and designed by KPEP to meet the State of Michigan's

published request for an RSOP.  *Id.* at ¶ 3.  KPEP bid on the RSOP and was awarded a contract by the State of Michigan.  *Id.*

KPEP's facility is not a prison.  *Id.* at ¶ 5.  KPEP employees are not employed by the State of Michigan.  *Id.* at ¶ 4; Webb Aff. at ¶ 2; Hill Aff. at ¶ 2; Rhinesmith Aff. at ¶ 2; Kruzona Aff. at ¶ 2; Banks Aff. at ¶ 2; Warr Aff. at ¶ 2.  "The State of Michigan does not control the individual day-to-day RSOP therapy and counseling, nor the therapists' decision making."  Webb Aff. at ¶ 6.

With respect to plaintiff's claim that he was not allowed to attend church services away from KPEP, defendant DeBoer (the Executive Director of KPEP), stated that plaintiff was restricted to the facility by his parole agent through the conditions of his parole.  DeBoer Aff. at ¶ 5.  Despite this restriction, plaintiff could have requested that a member of the clergy of a denomination of his choice visit with him on site for religious services, fellowship and worship.  Webb Aff. at ¶ 9.  With respect to plaintiff's claim that he was denied medical services, defendant DeBoer stated that while KPEP does not provide non-emergency medical care, its employees assist clients (such as plaintiff) in making medical appointments even if the client has no insurance.  DeBoer Aff. at ¶ 6.  In addition, KPEP will transport clients to the hospital in the case of a medical emergency.  *Id.*  The cost of medications is paid by KPEP which is then reimbursed by the MDOC.  *Id.*  Parolees, such as plaintiff, have the option of voluntarily withdrawing from the RSOP and returning to prison for medical care.  *Id.*

### 2.  KPEP employees are not state actors subject to liability under § 1983

A cause of action brought pursuant to § 1983 "basically seeks to deter *state* actors from using the badge of their authority to deprive individuals of their federally  guaranteed rights and to provide related relief."  *Richardson v. McKnight*, 521 U.S. 399, 403 (1997).  To hold a private

party liable under § 1983, the plaintiff must prove that the private party deprived him of a guaranteed right under color of state law and that the private party's actions were properly attributable to the state, i.e. that the party qualified as a state actor. *Kelm v. Hyatt*, 44 F.3d 415, 421 (6th Cir.1995).

Given their employment at KPEP and their functions performed at KPEP, defendants DeBoer, Hill, Kruzona, Webb, Kruzona, Rhinesmith and Banks assert that they are not "state actors" subject to liability under § 1983. "There are three tests employed by the courts to determine whether the challenged conduct is fairly attributable to the state: (1) the public function test, (2) the state compulsion test and (3) the symbiotic relationship or nexus test." *Collyer v. Darling*, 98 F.3d 211, 232 (6th Cir. 1996) (internal citations and quotation marks omitted).

### a. The public function test

"The public function test requires that the private entity exercise powers which are traditionally exclusively reserved to the state." *Id.*, 98 F.3d at 232. "The public function test has been interpreted narrowly." *Chapman v. Higbee Company*, 319 F.3d 825, 833 (6th Cir. 2003). "Only functions like holding elections, exercising eminent domain, and operating a company owned town, fall under this category of state action." *Id.* at 833-34 (citations omitted). Plaintiff, as a parolee, was under the legal custody of the MDOC. *See* M.C.L. § 791.238(1) ("Each prisoner on parole shall remain in the legal custody and under the control of the department [MDOC]"). However, unlike a prisoner confined to a correctional facility, the MDOC does not control every aspect of parolee's life. Rather, a parolee is free to live like any other member of society subject to the conditions of parole. As the Supreme Court explained in *Morrissey v. Brewer*, 408 U.S. 471 (1972):

> The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison.

*Morrissey*, 408 U.S. at 482.

KPEP's RSOP provides a program to treat deviant sexual behavior, allowing convicted criminals the opportunity to live outside of the prison walls and participate in the program to meet a condition of their parole. While correctional facilities offer therapy programs to prisoners, providing mental health therapy and treatment to parolees is not one of the types of powers traditionally reserved exclusively to the state like holding an election or exercising eminent domain. *See Chapman*, 319 F.3d at 833-34. On the contrary, "providing mental health services has not been a power which has traditionally been exclusively reserved to the state." *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir. 1992). Accordingly, neither KPEP nor its employees are state actors under the public function test.

### b. The state compulsion test

"The state compulsion test requires that a state exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state." *Collyer*, 98 F.3d at 232. The KPEP RSOP was developed independently to meet certain guidelines required by the State of Michigan. The RESOP provides services to parolees, such as plaintiff, pursuant to KPEP's contract with the state. The fact that KPEP was awarded a contract to treat MDOC parolees does not establish that the State of Michigan either coerced KPEP or provided significant encouragement for KPEP to establish the RSOP or

operate the RSOP in any particular manner. "More than mere approval or acquiescence in the initiatives of the private party is necessary to hold the state responsible for those initiatives." *Wolotsky*, 960 F.2d at 1335. Accordingly, neither KPEP nor its employees are state actors under the state compulsion test.

### c.     Symbiotic relationship or nexus test

"[U]nder the symbiotic relationship test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Collyer*, 98 F.3d at 232. Here, the KPEP employees were not state actors under the symbiotic relationship or nexus test. Plaintiff, as a parolee, was under the legal custody of the MDOC. *See* M.C.L. § 791.238(1). While plaintiff was restricted by the conditions of his parole, he was free to engage in any number of activities that did not violate those conditions. *See Morrissey*, 408 U.S. at 482. By agreeing to participate in the KPEP RSOP, plaintiff chose to meet certain conditions of his parole. Plaintiff voluntarily signed a number of documents upon his admission to the RSOP: a "Rules Agreement" regarding the major and minor rules in force at KPEP (docket no. 79-2); a "Waiver of Responsibility" relieving KPEP of responsibility for physical or mental injury that may be incurred while participating in the physical program conducted off the KPEP facility by KPEP personnel, and accepting responsibility for the cost of medical care that he might require (docket no. 79-3); a "KPEP Health Assessment" noting that he was unemployed, had no health insurance, and identifying two medical conditions (left foot toenail fungus and HTN (hypertension) (docket no. 79-4); a "KPEP Health Screening Form" (docket no. 79-5); and a "K-PEP/Muskegon Basic Information Form (docket no. 80-2). In addition, on August 31, 2010, KPEP staff completed a "New Resident

Intake Checklist," which included such items as explaining resident access to healthcare and issuing a resident handbook (docket 80-1).

While plaintiff participated in KPEP's RSOP to meet a condition of his parole, the treatment provided at KPEP was independent of the MDOC. As discussed, KPEP employees are not employed by the State of Michigan and the State (i.e., the MDOC) does not oversee the therapy and counseling provided by KPEP employees. Furthermore, the court takes judicial notice that KPEP provides a variety of similar services to the federal court on matters which are entirely unrelated to services provided to MDOC. For example, KPEP provides services with respect to federal criminal defendants awaiting trial and federal prisoners placed on supervised release. Accordingly, neither KPEP nor its employees are so closely linked to the State of Michigan or the MDOC as to be considered agents of the State under the symbiotic relationship or nexus test.

In summary, KPEP and its employee defendants are not state actors under either the public function test, the state compulsion test or the symbiotic relationship/nexus test. Accordingly, because defendants DeBoer, Hill, Kruzona, Webb, Kruzona, Rhinesmith and Banks are not state actors, they are not subject to plaintiff's § 1983 claims and are entitled to summary judgment in their favor.[3]

---

[3] Other courts have reached similar results in cases involving § 1983 claims directed at private treatment programs and/or their employees. *See Quigg v. Armstrong*, 106 Fed.Appx. 555, 556 (9th Cir. 2004) (where the plaintiff was placed in a private program after violating his parole, his § 1983 action alleging that required attendance at Narcotics Anonymous meetings violated his religious freedom under the First Amendment failed, because the defendants were employees of a private program that served as an alternative to prison, and unlike the state was free to offer a religion-based treatment program); *Edmond v. Clements*, – F. Supp. 2d –, 2012 WL 2523057 at *2-3 (D. Colo. June 29, 2012) (a private sex offender treatment program that contracted with state did not qualify as a state actor in the plaintiff parolee's § 1983 claim, where the plaintiff alleged that he did not receive a proper sex offender evaluation prior to imposition of sex offender conditions as part of his parole; in denying his claim the court noted that plaintiff did not allege that the private program and its employees were responsible for administering the evaluation, that the program or its employees conspired with the state to prevent his evaluation, that there was a close nexus between the

### 3. Nurse Warr

At all times relevant to this action, Nurse Warr was a licensed practical nurse employed by United Nursing Services, which was under contract to provide nursing services to KPEP. Warr Aff. at ¶¶ 2-3. Her limited duties at KPEP included performing initial health assessments of individuals enrolled at RSOP, taking blood pressures if the RSOP client had a concern, and answering simple questions. *Id.* at ¶ 3. If an RSOP client had a particular medical issue, she would pass it on to the client's case manager. *Id.* As a licensed practical nurse, Nurse Warr could neither prescribe nor administer medication to RSOP clients. *Id.* Nurse Warr had no direct or indirect relationship with the State of Michigan. She was not employed by either the State of Michigan or KPEP, and the State played no part in monitoring or directing the services she provided at KPEP. *Id.* at ¶ 10. There is no evidence that Nurse Warr's conduct was fairly attributable to the state under any of the relevant tests. Accordingly, the court concludes that the Nurse Warr is not a state actor subject to liability under § 1983.

### 4. Conclusion

Based on the foregoing, the motion for summary judgment filed by defendants DeBoer, Hill, Kruzona, Rhinesmith, Webb, Banks and Warr (docket no. 76) should be granted.

---

state department of corrections and the program, that the state had insinuated itself into the management of the private program, or that the program or its employees engaged in unlawful acts in fulfilling its side of the contract with the state); *Cashion v. KDI Facility Services*, 3:02-cv-2295-H, 2002 WL 31757626 at *1 (N.D.Tex. 2002) (where the plaintiff prisoner sustained an on-the-job injury while working for a private contractor (KDI) as part of a residential treatment program (Cenikor), neither KDI nor Cenikor were state actors within the purview of § 1983). *See also*, *McKendall v. Tanner*, 08-5046, 2009 WL 1811013 at *1-4, n. 20 (E.D. La. June 23, 2009) (where a parolee enrolled in a private drug treatment program operated by ACER for the purpose of meeting a condition of parole, and ACER terminated him from the program, parolee's subsequent federal habeas action against ACER based upon an alleged First Amendment violation was not cognizable because "ACER is a private corporation, not a state actor" and a private actor could not actionably suppress First Amendment rights).

**D.     Parole Agent Marcus Wallace**

At all times relevant to this lawsuit, defendant Marcus Wallace was employed by the MDOC as a Parole Agent/RSOP liaison at the Muskegon Parole Office in Muskegon, Michigan. Marcus Aff. at ¶ 1 (docket no. 27-2). In Count VI, plaintiff alleged that Wallace was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by denying him medication for high blood pressure and for a toe nail fungus. Amend. Compl. at p. 44. In Count VII, plaintiff alleged that Wallace violated his First Amendment right to practice his religion because Wallace told plaintiff that he was prohibited from attending church and would not be allowed to attend church while at RSOP. *Id.* at p. 45. Defendant Wallace seeks summary judgment on the ground of qualified immunity.

> Under the doctrine of qualified immunity, government officials performing discretionary functions are shielded from civil liability unless their conduct violates clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 816, 172 L.Ed.2d 565 (2009).

*Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir 2011). The court may exercise its sound discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

Here, Wallace contends that the second prong of the qualified immunity analysis is lacking because even if the court assumes that his actions resulted in violations of plaintiff's rights under the First and Eighth Amendments, such rights were not clearly established at the time of the alleged violations. "For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that his or her conduct violates that

right." *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991). In inquiring whether a constitutional right is clearly established, this court must look first to decisions of the United States Supreme Court, then to decisions of Sixth Circuit Court of Appeals, to other courts within our circuit, and finally to decisions of other circuits. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006). "Once a defendant raises qualified immunity, the burden is on the plaintiff to demonstrate that the official is not entitled to qualified immunity, by alleging facts sufficient to indicate that the government official's act in question violated clearly established law at the time the act was committed." *Simmonds v. Genesee County*, 682 F.3d 438, 444 (6th Cir. 2012) (internal quotations, citations and brackets omitted). *See also, Baker*, 471 F.3d 605 ("[w]hen a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity").

### 1.    Eighth Amendment claim

It is well established that an inmate has a cause of action under § 1983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (1976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

In support of his claim, Wallace contends that his duty to provide plaintiff with medical care under the Eighth Amendment claim was not clearly established. In *Estelle*, the

Supreme Court explained the principles underlying the government's responsibility for providing medical care to prisoners under the Eighth Amendment:

> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that (i)t is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."

*Estelle*, 429 U.S. at 103-04 (internal citations and footnotes omitted). Wallace observes that plaintiff's claims are not the "traditional" deliberate indifference case involving a prisoner, because that plaintiff was a parolee (not a prisoner) and placed in a facility operated by a private non-profit organization which had medical staff at the facility. Wallace Brief at pp. 5-6 (docket no. 27).

Plaintiff contends that had "a right to health care as a parolee forced to confinement at the RSOP," relying on *Estelle* and *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982). Plaintiff's Response at p. 1 (docket no. 45). Plaintiff's claims are without merit. While the Eighth Amendment principles set forth in *Estelle* were clearly established law when plaintiff was at the RSOP, the reasoning in *Estelle* did not apply to plaintiff because he was a parolee and not incarcerated at a correctional facility. Similarly, the *Youngberg* decision is distinguishable from plaintiff's claim because that decision involved the rights of a person involuntarily committed to a state institution for the mentally retarded, in which the state conceded that it had "a duty to provide adequate food, shelter, clothing, and medical care" to individuals committed to that institution. *Youngberg*, 457 U.S. at 324.

Despite his claim to the contrary, plaintiff was not "confined" to RSOP. Unlike a prisoner incarcerated at a state correctional facility or a mentally disabled person committed to a state institution, plaintiff was not wholly dependent on the government to treat all of his medical needs. Plaintiff was a parolee, whose living conditions were "very different from that of confinement in a prison." *Morrissey*, 408 U.S. at 482. While KPEP provided some medical screening, the services of a licensed practical nurse, transportation for medical emergencies, and assistance in scheduling appointments, plaintiff was ultimately responsible for obtaining and paying for his own medical care while he participated in RSOP. Moreover, he also had the choice of returning to the prison where all that he was seeking was available to him without any responsibility on his own part. In other words, he had upon placement at KPEP been deprived of nothing (the medical services at the prison remained available to him), but had been afforded the additional opportunity to obtain those services himself as he chose. At least one authority has determined that such a right was not clearly established as recently as 2009. *See Andrade v. Christ*, No. 08-cv-01649, 2009 WL 2848984 at *11 (D. Colo. Sept. 1, 2009) ("[T]he law was not, and still is not, clearly established as to whether a parole officer has an Eighth Amendment duty to arrange or pay for medical care for an offender placed in a halfway house. Plaintiff does not allege, nor does the court's independent research reveal any legal support for any such duty under these circumstances.").

Plaintiff has failed to meet his burden of demonstrating that Agent Wallace had a clearly established constitutional duty under the Eighth Amendment to provide him with medical treatment. Accordingly, Agent Wallace is entitled to summary judgment on the Eighth Amendment claim alleged in Count VI.

## 2.     First Amendment claim

Plaintiff's First Amendment claim against Wallace appears in ¶¶ 40 and 41 of his

amended complaint:

> 41.     I told Wallace "I dont [sic] have the money for any [legal] copies but I should
> be able to obtain free copies through a church I'm going to attend while I'm here."
>
> 42.     Wallace replied "you will not be allowed to attend church while your [sic]
> here."  I asked Wallace if the RSOP, offered any Christian Faith based religious
> service [and] Wallace replied 'no your [sic] here for treatment only."  I advised
> Wallace that this was a violation of my right to practice my religion."  Wallace
> replied "as a sex offender you have no rights."

Amend. Compl. at ¶¶ 41-42.  In Count VII, plaintiff seeks relief because Wallace refused to allow

him to go to church.

"The First Amendment provides in pertinent part that "Congress shall make no law

respecting an establishment of religion, or prohibiting the free exercise thereof."  It is well

established that "convicted prisoners do not forfeit all constitutional protections by reason of their

conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  "Inmates clearly

retain protections afforded by the First Amendment, including its directive that no law shall prohibit

the free exercise of religion."   *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal

citation omitted).  "Lawful incarceration brings about the necessary withdrawal or limitation of

many privileges and rights, a retraction justified by the considerations underlying our penal system."

*O'Lone*, 482 U.S. at 348 quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948) (brackets omitted).

This limitation of privileges arises "both from the fact of incarceration and from valid penological

objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security."

*Id.* citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974).  Evaluation of penological objectives is

committed to the considered judgment of prison administrators who are charged with and trained

in the running of the particular institution under examination. *Id.* at 349. To ensure that courts afford appropriate deference to prison officials, the Supreme Court has "determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.*

Agent Wallace contends that while plaintiff has a generalized right to attend church or participate in religious services, he did not have such a right while at RSOP, and that Wallace did not violate any clearly established law in effect when he prevented plaintiff from attending outside church services. The court's opinion screening plaintiff's claim noted that "[d]efendants were not obligated to bestow on [p]laintiff any more liberty than he could have expected as a prison inmate serving the term of his sentence." Opinion at p. 16 (docket no. 10). That being said, Agent Wallace states that as a prison inmate, plaintiff would not have been allowed to leave the prison to attend church in the community; rather plaintiff would be entitled to practice his religion with permissible restrictions. Other than referring to the screening opinion, Wallace provides no legal authority in support of his position.

Plaintiff states that he has such a right, citing *Everson v. Board of Education*, 330 U.S. 1 (1947), *Mozert v. Hawkins Public Schools*, 765 F.2d 75, 78 (6th Cir. 1985), and MDOC Policy Directive 05.03.150 (which, according to plaintiff states that "parolees have a right to practice their religion"). However, none of these citations support plaintiff's claim that Agent Wallace violated a clearly established First Amendment right to attend church services outside of RSOP. As Wallace points out, while *Everson* addressed rights under the First Amendment, that case involved an issue under the establishment clause, not the free exercise clause under which plaintiff is

proceeding in this action, i.e., challenging a statute on the ground that "taxation for transportation of children to church schools constitutes support of a religion by the State". *Everson*, 330 U.S. at 7-8. *Mozert* did not address the free exercise rights of parolees. Rather, that decision addressed whether the compulsory use of certain textbooks violated the First Amendment's free exercise clause and the fundamental right of parents to control the religious and moral instruction of their children. *Mozert*, 765 F. 2d at 75-78. Finally, contrary to plaintiff's assertion, MDOC Policy Directive 05.03.150 ("Religious Beliefs and Practices of Prisoners") does not apply to parolees participating in private programs. Rather, Policy Directive 05.03.150 ¶ A states that "For purposes of this policy, 'prisoner' includes parolees in corrections centers and Technical Rule Violation Centers (TRVs) and probationers in the Special Alternative Incarceration Program (SAI)." Here, plaintiff was not housed in a corrections center or TRV at the time of the alleged constitutional violations.

Plaintiff has failed to meet his burden of demonstrating that Agent Wallace violated plaintiff's clearly established constitutional right under the First Amendment's free exercise clause

to attend religious services while attending a privately operated treatment facility.[4]   Accordingly, Agent Wallace is entitled to summary judgment on the First Amendment claim alleged in Count VII.

## IV.   Defendants' Motion to dismiss

Defendants  DeBoer, Hill, Kruzona, Rhinesmith, Webb,  Banks and  Warr also filed a motion to dismiss pursuant to Fed. Rules Civ. Proc. 12(b)(6) for failure to state a claim for relief. These defendants subsequently filed a motion for summary judgment, *see* discussion in § III.C., which effectively superseded the motion to dismiss, by providing a factual record demonstrating that these defendants were not state actors subject to liability under § 1983. Because plaintiff cannot state a claim for relief under § 1983 against these defendants,  their motion to dismiss (docket no. 66) should also be granted.

## V.   Recommendation

For the reasons set forth above, I respectfully recommend that defendant Webb's "Motion to correct oversight or omission in this court's January 31, 2012 order" (docket no. 68) be

---

[4] The court is aware of some federal decisions which determined that forcing prisoners and parolees to attend a religiously focused substance abuse program as a condition of their confinement or parole violates their rights under the First Amendment's establishment clause. *See Goodwin v. Hamilton*, No. 10-cv-11909, 2011 WL 893118 at *4 (E.D. Mich. March 14, 2011) (citing *Inouye v. Kemna*, 504 F.3d 705, 713 (9th Cir.2007); *Warner v. Orange County Dep't of Prob.*, 115 F.3d 1068, 1075 (2d Cir.1997); *Kerr v. Farrey*, 95 F.3d 472, 479–80 (7th Cir.1996); *Cain v. Caruso*, No. 08–CV–14699, 2009 WL 2475456 at*11 (E.D.Mich. Aug.11, 2009) (adopting R & R); and *Hanas v. Inner City Christian Outreach, Inc.*, 542 F.Supp.2d 683, 701 (E.D.Mich.2008)).  However, the court does not consider these decisions as demonstrating that plaintiff had a clearly established First Amendment right to attend church while participating in the RSOP.  First, these cases refer to a coercive situation which was not present in the present action, because there is no allegation that KPEP's RSOP had a "religious focus".  Second, none of these cited decisions were issued by the United States Supreme Court or the Sixth Circuit Court of Appeals, the two primary courts which  this court looks to in determining whether a constitutional right is clearly established.  *See Baker*, 471 F.3d at 606.   Third, these decisions do not appear to differentiate between the rights of prisoners versus the rights of parolees. As discussed, *supra*, the status of a parolee is much different than the status of a prisoner.  Fourth, even if the court were to accept the premise that these decisions demonstrate a clearly established constitutional right arising under the First Amendment's establishment clause, that right is not applicable to plaintiff's claim which involves the First Amendment's free exercise clause.

**GRANTED** and that the Court's Order for partial dismissal and partial service (docket no. 11) be amended accordingly.

I further recommend that motions for summary judgment filed by defendants Berrios (docket no. 48) and Condini (docket no. 63) be **GRANTED**.

I further recommend that defendants DeBoer, Hill, Kruzona, Rhinesmith, Webb, Banks and Warr's motions to dismiss (docket no. 66) and for summary judgment (docket no. 76) be **GRANTED**.

I further recommend that defendant Wallace's motion for summary judgment (docket no. 26) be **GRANTED**.

I further recommend that plaintiff's cross-motion for summary judgment (docket no. 85) be **DENIED**.

I further recommend that this action be **DISMISSED**.


Dated:  February 19, 2013                          /s/ Hugh W. Brenneman, Jr.
                                                   HUGH W. BRENNEMAN, JR.
                                                   United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).